# Nos. 26-1829, -1832, -1996

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

Nos. 26-1829, 26-1996

AMERICAN COUNCIL OF LEARNED SOCIETIES, AMERICAN HISTORICAL ASSOCIATION, and MODERN LANGUAGE ASSOCIATION,

Plaintiffs-Appellees-Cross-Appellants,

v.

MICHAEL McDONALD, in his official capacity as Chairman of the National Endowment for the Humanities; NATIONAL ENDOWMENT FOR THE HUMANITIES, UNITED STATES DOGE SERVICE; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; NATE CAVANAUGH, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration; and JUSTIN FOX, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration,

Defendants-Appellants-Cross-Appellees.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR NATIONAL ENDOWMENT FOR THE HUMANITIES, MICHAEL MCDONALD, UNITED STATES DOGE SERVICE; AMY GLEASON; NATE CAVANAUGH & JUSTIN FOX**

**CAPTION FOR NO. 26-1832 AND COUNSEL INFORMATION LISTED ON INSIDE COVER**

No. 26-1832

THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated,

Plaintiffs-Appellees,

v.

NATIONAL ENDOWMENT FOR THE HUMANITIES, MICHAEL MCDONALD, in his official capacity as Chairman of the National Endowment for the Humanities; UNITED STATES DOGE SERVICE; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; NATE CAVANAUGH, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration; and JUSTIN FOX, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration,

Defendants-Appellants.

JAMES M. MCDONALD
*United States Attorney for the Southern District of New York*

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
DEREK WEISS
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

A. Statutory Background .......... 5

B. Factual Background .......... 6

C. Prior Proceedings .......... 10

SUMMARY OF ARGUMENT .......... 15

STANDARD OF REVIEW .......... 18

ARGUMENT .......... 18

I. Plaintiffs' Ultra Vires Claims Fail For Multiple Reasons. .......... 18

II. In Selective Grant Programs, The Government Can Subsidize Particular Viewpoints Without Violating The First Amendment. .......... 27

III. Plaintiffs' First Amendment Political-Association Claims Fail For Multiple Reasons. .......... 33

IV. Plaintiffs' Equal Protection Claims Fail For Multiple Reasons. .......... 36

V. Class-wide Relief Was Improper. .......... 43

CONCLUSION .......... 46

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 29, 30, 31

*Allen v. Milligan*,
146 S. Ct. 1377 (2026) (per curiam) ........ 37

*American Council of Learned Soc'ys v. McDonald*,
792 F. Supp. 3d 448 (S.D.N.Y. 2025) ........ 5
No. 25-1905 (2d Cir. argued May 29, 2026) ........ 15

*American Fed'n of Lab. v. Department of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) ........ 25
No. 25-339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) ........ 25

*Branti v. Finkel*,
445 U.S. 507 (1980) ........ 34

*Cammarano v. United States*,
358 U.S. 498 (1959) ........ 31

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........ 27

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 26

*Department of Educ. v. California*,
604 U.S. 650 (2025) (per curiam) ........ 1, 11, 20, 32

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 20, 21

*Heller v. Doe by Doe*,
509 U.S. 312 (1993) ........ 42

*Horn v. Medical Marijuana, Inc.*,
80 F.4th 130 (2d Cir. 2023) ........ 18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ........ 18

*Loving v. Virginia*,
388 U.S. 1 (1967) ........................................................................................................ 38

*Miller v. Johnson*,
515 U.S. 900 (1995) ..................................................................................................... 37

*Morgan v. United States*,
304 U.S. 1 (1938) ........................................................................................................ 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ...................................................................................................... 35

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........................................................................................ 28, 29, 33

*National Insts. of Health v. American Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ...................................................................................... 1, 20, 32

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) ...................................................................................................... 40

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ............................................................... 19, 20, 21, 24, 25, 26

*Palmore v. Sidoti*,
466 U.S. 429 (1984) ..................................................................................................... 38

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ..................................................................................................... 37

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
990 F.3d 217 (2d Cir. 2021) ....................................................................................... 31

*Porwancher v. NEH*,
No. 25-cv-01180 (D.D.C filed Apr. 16, 2025)..............................................................15

*Regan v. Taxation with Representation of Wash.*,
461 U.S. 540 (1983) ............................................................................................. 28, 31

*Rosenberger v. Rector & Visitors of the University of Virginia*,
515 U.S. 819 (1995) ........................................................................................ 11, 27, 33

*Rust v. Sullivan*,
500 U.S. 173 (1991) ................................................................................ 27, 28, 29, 31

*San Francisco A.I.D.S. Found. v. Trump*,
No. 25-cv-01824 (N.D. Cal. filed Feb. 20, 2025) ........ 15

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) ........ 26, 27

*Thakur v. Trump*,
No. 25-cv-04737 (N.D. Cal. filed June 4, 2025) ........ 15
176 F.4th 1187 (9th Cir. 2026) (per curiam) ........ 33
No. 26-210 (U.S.) (Aug. 18, 2026) ........ 33

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........ 23, 26

*United States v. American Libr. Ass'n*,
539 U.S. 194 (2003) ........ 30

*United States v. Marchetti*,
466 F.2d 1309 (4th Cir. 1972) ........ 32

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........ 26

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ 43

*West Virginia v. B.P.J. by Jackson*,
146 S. Ct. 2356 (2026) ........ 45

*Wygant v. Jackson Bd. of Educ.*,
476 U.S. 267 (1986) ........ 38-39

*Yale New Haven Hosp. v. Becerra*,
56 F.4th 9 (2d Cir. 2022) ........ 13, 21, 25

**Executive Orders**

*Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 25, 2021) ............ 35, 41

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025) .................................. 6, 41

*Establishing and Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ........................................ 7

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ..................... 6

*Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order No. 14222, 90 Fed. Reg. 11095 (Mar. 3, 2025) ............................. 6–7, 10

**Constitutional Provisions, Statutes, and Rules**

U.S. Const.,
amend. I ........................................................................................................ 32
amend. V ....................................................................................................... 37

20 U.S.C. § 956 ........................................................................................ 5, 26, 32

28 U.S.C.
§ 1291 ............................................................................................................. 3
§ 1292 ............................................................................................................. 3
§ 1331 ............................................................................................................. 3
§ 1491 ........................................................................................................... 20

Pub. L. No. 118-42, 138 Stat. 25 (2024) ....................................................................5

Federal Rule of Appellate Procedure 4 ........................................................................3

Federal Rule of Civil Procedure 23 ................................................................. 18, 43

**Websites**

Libr. Of Cong., *Black History Month*, https://perma.cc/PAS7-LFYF............................39

NEH, *NEH's Application Review Process*, https://perma.cc/MV8T-MZAJ.......................6

Racial Equity Tools Glossary, *Racial Equity Tools*, https://perma.cc/E9BM-8GYR ...42

## INTRODUCTION

The district court issued a sweeping order that inserted the court into Executive Branch decisionmaking, prohibited the Executive Branch from carrying out the President's priorities in determining how to exercise funding discretion, and treated determinations about whether to fund humanities projects relating to diversity, equity, and inclusion (DEI) as race discrimination. It should be reversed.

This case involves the termination of grants issued by the National Endowment for the Humanities (NEH). As the Supreme Court has recently and repeatedly made clear, district courts cannot enjoin such terminations under the Administrative Procedure Act (APA) because the Tucker Act bars plaintiffs from challenging their grant terminations through an APA arbitrary-and-capricious claim. *Department of Educ. v. California*, 604 U.S. 650, 650 (2025) (per curiam); *National Insts. of Health v. American Pub. Health Ass'n (NIH)*, 145 S. Ct. 2658 (2025). The district court here purported to avoid that limitation through a set of overlapping rulings that cannot be reconciled with basic principles of administrative or constitutional law.

The district court began by holding that although each entity whose grant was terminated received a letter bearing the signature of the NEH's Acting Chairman, who concededly has authority to terminate grants, plaintiffs had viable ultra vires claims because White House officials who were detailed to the agency exercised what the district court regarded as undue influence on the decisions. The idea that agency

action can be unlawful because the President's advisors exercised too much influence turns basic principles of executive power on their head.

Next, the district court held that the government engaged in impermissible viewpoint discrimination by terminating grants that would promote messages with which it disagreed. The court purported to recognize longstanding Supreme Court holdings that entitle the government to do exactly that in competitive grant programs, so long as it does not leverage governmental funding to coerce speech outside the government program—a concern that plainly is not present here. But the court nonetheless attempted to distinguish those holdings on the ground that here, *Congress* did not itself restrict the funding of DEI grants or authorize White House (as opposed to NEH) officials to make grant-termination decisions. That is a *non sequitur*. The First Amendment applies equally to all branches of government, so if (as the court suggested) Congress may terminate grants based on DEI, the Executive Branch must be able to as well.

Finally, the district court held that the government had acted in an impermissibly discriminatory way in two respects, each mistaken. First, the court faulted the government for the common-sense measure of beginning the process of ensuring that grants were consistent with this administration's priorities by focusing on grants that had been issued during the Biden Administration as opposed to when the current President was in office. And second, the court held that a preference to terminate grants that reflected principles of DEI constituted race discrimination (a

view that, among various defects, cannot be reconciled with the apparent acceptance of the prior administration's preference for issuing such grants in the first place).

Finally, the court issued a broad class-certification ruling that ignored salient differences among the numerous grants at issue here and thus provided broad relief without any meaningful effort to map it on to the actual legal claims asserted. The result was an overbroad ruling based on flawed reasoning that provides multiple grounds for reversal.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, although the court's jurisdiction was contested in some respects based on the preclusive effect of the Tucker Act. The district court granted summary judgment to plaintiffs and entered final judgment in both consolidated cases on May 8, 2026. [Dkt.291_at_143; Dkt.292_at_1–2]. The government filed timely notices of appeal on July 6, 2026. [Dkt.294; *Guild*_Dkt.174]; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1291. Even if the district court's determination that it need not resolve an APA arbitrary-and-capricious claim because it would have provided plaintiffs with no additional relief were thought to prevent the judgment from being final, *see* [Dkt.291_at_57; Dkt.291_at_65 n.3], this Court would nonetheless have jurisdiction under 28 U.S.C. § 1292(a)(1) because the order grants a permanent injunction.

## STATEMENT OF THE ISSUES

The issues presented are:

1) Whether plaintiffs who received grant termination letters from the agency head are entitled to prevail on ultra vires claims on the ground that other Executive Branch officials exercised undue influence on the agency head's decisions.

2) Whether the First Amendment prohibits the Executive Branch from considering the viewpoints furthered by research projects when granting or terminating funding for those projects through competitive grant programs.

3) Whether a new administration violates the First Amendment when, in its effort to ensure that grants are consistent with the administration's priorities, it starts its review by considering grants issued by a different administration rather than issued under the oversight of the incumbent President, and if so whether that remains true even if the only grants that remain in force were issued under that prior administration.

4) Whether the equal protection component of the Fifth Amendment prohibits the government from terminating grants on the ground that they promote DEI.

5) Whether a class was properly certified that encompasses all grants that were terminated after a process that involved multiple steps and rationales.

## STATEMENT OF THE CASE

Plaintiffs in these consolidated appeals challenge the termination of grants awarded by the National Endowment for the Humanities ("NEH"). Judge McMahon granted summary judgment to plaintiffs, declared the terminations unlawful, and enjoined the government from enforcing the terminations or implementing similar terminations. *American Council of Learned Soc'ys v. McDonald*, 792 F. Supp. 3d 448, 456 (S.D.N.Y. 2025) (slip opinion at [JA__]).

### A. Statutory Background

Congress "established … the National Endowment for the Humanities" to provide "grants" and "other forms of assistance." 20 U.S.C. § 956(a), (c). NEH may award funding to humanities projects within ten enumerated categories including, among others, "develop[ing] and encourag[ing] the pursuit of a national policy for the promotion of progress and scholarship in the humanities," "support[ing] research and programs to strengthen the research and teaching potential of the United States in the humanities," "initiat[ing] and support[ing] programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage," and "support[ing] the publication of scholarly works in the humanities." *Id.* § 956(c)(1)–(2), (4), (8). In recent years, Congress has appropriated slightly more than $200 million per year to NEH to fund such programs. *See, e.g.*, Pub. L. No. 118-42, 138 Stat. 25, 281 (2024).

NEH grant programs are highly selective, funding approximately 500 of the 2,500 grant applications received annually, with some individual grant programs funding as few as "3 percent" of applicants. NEH, *NEH's Application Review Process*, https://perma.cc/MV8T-MZAJ. Grants range "in amounts … from $2,500 to $10 million." *Id.*

**B. Factual Background**

**1.** In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities. Several of these Orders directed agencies, where consistent with law, to end funding related to DEI, gender identity, and environmental justice. *See Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, §§ 1, 2(b)(i)–(ii), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025); *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, § 3(g), 90 Fed. Reg. 8615, 8616 (Jan. 30, 2025).

Other Executive Orders established the Department of Government Efficiency (DOGE) within the White House and instructed "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead" to "review all existing covered … grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered … grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." *Implementing the President's "Department of Government Efficiency" Cost*

*Efficiency Initiative*, Exec. Order No. 14222, § 3(b), 90 Fed. Reg. 11095, 11095–96 (Mar. 3, 2025); *see Establishing and Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14158, 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025). Agencies were directed to complete this review "within 30 days." Exec. Order No. 14222, § 3(c), 90 Fed. Reg. at 11096.

**2**. In early February 2025, NEH leadership began its review of grants, instructing NEH program directors to identify grants that might implicate the President's Executive Orders. [Dkt.276-5_at_2]; [Dkt.276-6_at_3]. More than 350 active grants that NEH staff identified as being connected to the Executive Orders were "carefully reviewed" by NEH leadership—Acting Chairman Michael McDonald and Assistant Chair for Programs Adam Wolfson—and were ultimately cancelled as discussed below. [Dkt.276-6_at_3–4]; *see* [Dkt. 248-6]; [Dkt.276-15_at_2]. NEH used the shorthand "DEI" to refer to all the topics covered by the Executive Orders, including diversity, equity, inclusion, and accessibility (DEIA); gender ideology; and environmental justice. *See* [Dkt.276-6_at_3].

In March 2025—while NEH's review was ongoing—Nate Cavanaugh and Justin Fox, two members of a DOGE team assigned to small agencies, were detailed to NEH to assist the agency in implementing the Executive Orders. They engaged in their own review, and at an early stage of the process used a list of DEI-related search terms, such as "LGBTQ," "inclusion," "queer," "pansexual," "BIPOC (Black, Indigenous, People of Color)," "cultural appropriation," and "tribal." [Dkt.276-

8_at_375]. Fox also used ChatGPT, an artificial-intelligence tool, to write short "DEI rationale[s]" to "give context to [Wolfson] and [McDonald] on why [a] grant may be related to DEI." [Dkt.276-2_at_34] (Fox transcript).

In the course of correspondence between the NEH personnel and the detailees from DOGE, Acting Chairman McDonald informed Fox that the list his staff had prepared, discussed above, "list[ed] all the applications implicated by the EOs," and that he and his team "were getting ready to cancel them today but understand that you [Fox and Cavanaugh] will do so" for them. [Dkt.276-15_at_2].

The detailees had also sent McDonald and Wolfson a file containing the grants that NEH staff had not flagged as DEI-related and asked McDonald and Wolfson to "review [them] for DEI or wasteful spend," and make a determination for each grant in the Excel file. [Dkt.276-15_at_2]. By putting his initials next to the grants he desired to keep, McDonald ultimately wound up flagging only "a few important projects—such as the papers of George Washington—whose cancellation," he explained, "would not reflect well on any of us." [Dkt.276-6_at_4]. McDonald raised doubts that many of the other grants should be cancelled and made a "recommendation" to retain the projects that his staff had not flagged, but acknowledged that he lacked the time for "the individualized consideration" that he had given to those flagged by his staff. [Dkt.276-6_at_4]. But he acknowledged that the new administration "also wishes to cancel funding to assist in deficit reduction" even if the grants do not implicate DEI, and stated that "as you've made clear, it's

your decision on whether to discontinue funding any of the projects on this list." [Dkt.276-6_at_4].

Fox responded with a list that excluded "the grants [McDonald] flagged to keep" along with a few others, and told McDonald they "need [his] final approval on [those] grants … otherwise they will be terminated." [Dkt.276-21_at_2]. McDonald responded with an "initialed version" reflecting McDonald's decision on each grant. [Dkt.276-24_at_2]. In some cases, McDonald indicated with his initials a decision not to terminate a particular grant. *See* [Dkt.276-25_at_23, 31, 36, 83, 86–87].

After moving all the grants McDonald initialed onto the list of grants to keep, Fox then emailed McDonald and Wolfson the final lists of grants to keep and to terminate, *see* [Dkt.276-26], and said that Fox and Cavanaugh "will begin to execute" the terminations "with your permission." [Dkt.276-26_at_2]. McDonald replied that he had "looked over the two attachments and [he] d[id]n't have any questions or concerns." [Dkt.276-6_at_2]. McDonald then reviewed the termination letters Fox drafted and, on April 2, approved Fox to send them over McDonald's signature. [Dkt.276-28, Dkt.276-29]. It was Fox who prepared and emailed the termination letters to the grant recipients.

Ultimately, all but 42 of NEH's 1,519 open grants were terminated, [Dkt.276-26_at_4], including every open grant awarded during the first Trump administration, *see* [Dkt.276-26_at_5–6] (listing the earliest start date on any retained grant as October 1, 2021). As noted, a meaningful portion of these terminations were grants that had

been flagged during the review by NEH staff, and the NEH Acting Chairman signed off on the final list of grants to be terminated, and the text of the termination letter, before letters were sent out over his signature.

### C. Prior Proceedings

**1.** Three nonprofit organizations—American Council of Learned Societies (ACLS), American Historical Association, and Modern Language Association of America—filed a lawsuit against NEH, DOGE, and several official-capacity defendants. *ACLS* Dkt. 1. As relevant here, the lawsuit brought "nonstatutory claims" "challenging the termination of grants, including the grants of [the three organizations] and their members." *Id.* at 34. Another nonprofit organization, The Authors Guild (Guild), and seven individual grant recipients subsequently filed a putative class-action lawsuit against the same defendants, alleging APA claims that the grant terminations were arbitrary and capricious or contrary to law, as well as nonstatutory claims similar to those brought by the ACLS plaintiffs. *Guild* Dkt. 1.

The district court *sua sponte* consolidated the two cases. [Dkt.Sheet_Dkt.52]. Both sets of plaintiffs sought preliminary injunctions and the government moved to dismiss both cases. *ACLS* Dkts. 65, 76; *Guild* Dkts. 23, 24.

**2.** The district court resolved the competing motions in both cases in a single opinion. [Dkt.116]. As relevant here, the court rejected the government's argument that the Tucker Act precluded jurisdiction over the claims—including the Guild plaintiffs' APA arbitrary-and-capricious claims—purporting to distinguish the

Supreme Court's decision in *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam), based on the way plaintiffs framed their request for relief. [Dkt.116_at_43–51]. Turning to the motions for preliminary injunctions, the court concluded neither set of plaintiffs had demonstrated a likelihood of success on their claim that "DOGE terminated the grants and that in so doing it acted *ultra vires*." [Dkt.116_at_67–70]. Because this was the ACLS plaintiffs' only remaining basis for a preliminary injunction, their motion was denied.

The court concluded, however, that the Guild plaintiffs had "demonstrated that they are likely to succeed on the merits of their claims that the Mass Terminations violate the First Amendment." [Dkt.116_at_53]. Although the court purported to recognize that the Supreme Court has held that the government may choose "to fund one activity to the exclusion of the other," [Dkt.116_at_61], the Court read *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995), to preclude the government from considering viewpoints when administering selective grant programs. [Dkt.116_at_62]. The district court also concluded that the Guild plaintiffs were likely to succeed on their argument that terminating "grants that were awarded to scholars during the Biden Administration" violated the First Amendment's prohibition against "withdraw[ing] … a benefit because of the recipient's association with a political party." [Dkt.116_at_60]. Without certifying a class, [Dkt.116_at_74–75], the district court ordered that all putative class members'

funds be "escrowed" and not reobligated to other potential grant recipients, [Dkt.116_at_80-81].

**3.** After discovery, both sets of plaintiffs amended their complaints "to add one claim under the equal protection component of the Fifth Amendment's Due Process Clause," on the ground that terminating grants whose research topic related to a protected characteristic was impermissible. *ACLS* Dkts. 217, 223. The Guild plaintiffs moved to certify a class, *ACLS* Dkts. 242–43, and the parties filed cross-motions for summary judgment, *ACLS* Dkts. 246–47, 275, 278.

The district court granted plaintiffs' motion for summary judgment. [Dkt.291]. While plaintiffs conceded that *Department of Education* and *NIH* "'appear to foreclose this Court's jurisdiction over their APA claims,'" the district court nonetheless refrained from deciding that issue because "no additional relief would turn on resolution of Plaintiffs' APA claims." [Dkt.291_at_57]. The district court rejected the application of the Tucker Act to the constitutional and ultra vires claims. [Dkt.291_at_38-56].

The district court granted summary judgment to plaintiffs on their ultra vires claims on the theory that DOGE rather than McDonald terminated the grants. The district court recited this Court's legal standard that "[t]o prevail on a nonstatutory *ultra vires* claim, a plaintiff must show that '(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to

a specific prohibition in the statute that is clear and mandatory.'" [Dkt.291_at_59] (quoting *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 27 (2d Cir. 2022)). But the district court then relied on a single out-of-circuit district-court decision to conclude that it need not identify any specific prohibition in the statute. [Dkt.291_at_67]. The court concluded that the claims were not covered by the Tucker Act because Congress did not provide the equitable relief that plaintiffs seek. [Dkt.291_at_61–62]. And the court concluded that DOGE likely was not an "agency" that could be sued under the APA, which would have provided an adequate alternative remedy. [Dkt.291_at_66]. Finally, the court acknowledged McDonald's testimony that he "'was the final decider'" but said other parts of the record "undermine that claim," concluding that contrary to McDonald's testimony, DOGE in fact terminated the grants. [Dkt.291_at_79].

The district court also granted summary judgment for the plaintiffs on their First Amendment free-speech claims, reasoning that the "familiar principle that [the government] need not subsidize every form of protected expression" did not apply here because "Congress [did not] define the subjects and activities that federal funds will support"—suggesting that the grant terminations would not have violated the First Amendment if they had been done by statute rather than executive action. [Dkt.291_at_98–99]; *see* [Dkt.291_at_101, 104]. The court also suggested that the "funding consequences" would be permissible if they had been done by "prospective regulations, promulgated by the statutorily authorized official, defining the permissible

scope of a federal program pursuant to an express statutory funding restriction." [Dkt.291_at_100].

The court also granted summary judgment to plaintiffs on their First Amendment political-association claims. According to the district court, when the government began its review of grants to determine whether they were consistent with the Trump Administration's priorities by examining grants awarded during the Biden Administration rather than the Trump Administration itself, it was impermissibly "terminat[ing] grants previously awarded because they are associated, or perceived to be associated, with a political opponent." [Dkt.291_at_107].

The district court also granted summary judgment to plaintiffs on their equal-protection claims. In the district court's view, distinguishing grants that "focus on a particular race" from grants that are colorblind is a racial classification that warrants heightened scrutiny. [Dkt.291_at_110–12]. The court applied the same reasoning to other protected characteristics. The district court concluded the terminations could not survive either strict scrutiny or rational basis review. [Dkt.291_at_122–23].

In the same order, the district court stated that it was certifying a class and two subclasses. [Dkt.291_at_130–38]. The class is defined to include all NEH "grant recipients whose grants were awarded on or after January 20, 2021 and terminated" through "termination notices sent on April 1 through April 3, 2025," excluding the ACLS plaintiffs and their members. [Dkt.291_at_131]. The first subclass, the "DEI Subclass," consists of "class members whose grants were marked by Defendants for

termination as 'DEI.'" [Dkt.291_at_131]. The second subclass, labelled the "Biden-era Subclass," consists of all other class members. [Dkt.291_at_131]. As the district court explained, this second class is "something of a misnomer" because the subclasses "separate DEI-marked grants from non-DEI-marked grants within an already Biden-era class." [Dkt.291_at_135 n.7].

The district court declared the grant terminations "unlawful, unconstitutional, *ultra vires*, and without legal effect." [Dkt.291_at_142]. The government was permanently enjoined "from enforcing, implementing, or giving any effect to" the terminations, or "terminating those grants on the same or substantially similar impermissible bases." [Dkt.291_at_143]. The judgment was entered on both dockets. The government appealed both judgments. [Dkt. 294; *Guild*_Dkt.174]. The ACLS plaintiffs cross-appealed (although this brief discusses only the government's appeal). [Dkt.295].[1]

## SUMMARY OF ARGUMENT

The Tucker Act bars plaintiffs from bringing an APA claim challenging their grant terminations as arbitrary and capricious. Instead, plaintiffs asserted four novel legal theories to challenge their grant terminations, but none has merit. The district

[1] The NEH grant terminations at issue here are also subject to other, ongoing litigation. *See, e.g.*, *Porwancher v. NEH*, No. 25-cv-01180 (D.D.C filed Apr. 16, 2025); *Thakur v. Trump*, No. 25-cv-04737 (N.D. Cal. filed June 4, 2025); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-cv-01824 (N.D. Cal. filed Feb. 20, 2025).

An appeal from an interlocutory order in the ACLS case remains pending. *See ACLS v. NEH*, No. 25-1905 (2d Cir. argued May 29, 2026).

court nonetheless granted judgment to plaintiffs on all four theories. Its reasoning throughout was premised on significant fundamental errors.

The NEH Acting Chairman terminated these grants through termination notices (the text of which he approved) with his signature (which he authorized) to a specific list of grants he had contributed to and approved. Nobody disputes that the Acting Chairman had authority to terminate the grants. Nonetheless, the district court granted relief on ultra vires claims on the theory that an office within the White House exercised undue influence over the decisions about which grants should be terminated. But presidential control over executive branch agencies does not state an ultra vires claim. There was no specific statutory provision violated. And, in any event, ultra vires review is unavailable because Congress has directed that plaintiffs can obtain review of their claims through the Tucker Act. And, even if the Tucker Act were for some reason thought not to apply, review would then be available under the APA.

The First Amendment does not prevent the government from considering the viewpoints advanced by the projects it is funding when it administers competitive grant programs. The district court largely agreed, but held that Congress, rather than the NEH, needed to determine which viewpoints to fund. There is no authority for the extraordinary proposition that First Amendment rights depend on which branch of government decides the government's priorities.

The district court also concluded that terminating grants awarded during the Biden Administration violated the First Amendment's limits on political-association retaliation. But the record does not show that Biden-era grants were treated worse (particularly because the only grants that were retained were Biden-era grants). There is nothing untoward about beginning an effort to identify DEI grants by looking at grants awarded during the administration that had prioritized DEI. More fundamentally, the First Amendment question is whether grant recipients who associated politically with the Biden Administration were treated worse, and there is no evidence that the political associations of any grant recipients were considered.

Equal protection principles do not preclude the government from prioritizing colorblind research over research that views its topic through a lens of race or research that focuses on a particular racial group. The same principles apply to sex, religion, and other protected characteristics. Research favoring DEI is not a classification that warrants heightened scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause (and the termination of such grants is certainly no more suspect than the selection of grants on that basis in the first place). The grant terminations plainly survive rational basis review.

Finally, class-wide adjudication of these claims was improper. The ultra vires claims are premised on DOGE's involvement, but the NEH identified the relationship to DEI without DOGE's input for many of the grants that were terminated. The First Amendment claims suffer similar flaws. And the subclass that

succeeded on its equal-protection claims included grants flagged as DEI because of their connection to environmental justice and gender ideology, at least some of which would not be subject to heightened scrutiny even under the district court's flawed theory.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Horn v. Medical Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023) (quotation marks omitted).

This Court applies an "abuse-of-discretion standard to both the lower court's ultimate determination on [class] certification, as well as to its rulings that the individual Rule 23 requirements have been met." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34 (2d Cir. 2009).

## ARGUMENT

### I. Plaintiffs' Ultra Vires Claims Fail For Multiple Reasons.

Plaintiffs' ultra vires claims are difficult to understand. They frame the claims as whether Acting NEH Chairman McDonald terminated the grants, but the record plainly shows he did. Instead, the crux of their allegations, which the district court adopted, is that officials from DOGE, an office within the White House, exercised

undue influence in the process leading up to the terminations on the decisions about which grants should be terminated.

Under either theory, the ultra vires claims fail at every level. Statutory review is available through the Tucker Act, foreclosing nonstatutory review. And even were the Tucker Act somehow not applicable, APA review would then be available, similarly foreclosing ultra vires review.

On the merits, the facts clearly show that McDonald authorized the termination and approved sending the termination notices bearing his signature. There is no plausible claim that the termination letters were ineffective. The alternative theory that it was somehow improper for White House officials to provide policy direction to an Executive Branch agency flips principles of executive power on their head; no degree of White House influence over which grants to terminate would state an ultra vires claim.

**A.** Nonstatutory ultra vires review is a holdover predating the APA, under which "courts sometimes entertained 'a bill in equity to attack administrative action when no statutory review was available.'" *Nuclear Regul. Comm'n v. Texas (NRC)*, 605 U.S. 665, 680 (2025). In light of modern judicial-review statutes, however, ultra vires review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id.* at 681.

These ultra vires claims are contract claims that would be properly brought in the Court of Federal Claims under the Tucker Act. *See* 28 U.S.C. § 1491(a)(1) (exclusive jurisdiction in Court of Federal Claims over contract claims). The Supreme Court has recently and repeatedly made clear that is the appropriate procedure to challenge grant terminations. *Department of Educ. v. California*, 604 U.S. 650, 650 (2025) (per curiam); *National Insts. of Health v. American Pub. Health Ass'n (NIH)*, 145 S. Ct. 2658 (2025).

The district court's sole stated reason that review in the Court of Federal Claims was inadequate was that it could not provide equitable relief. [Dkt.291_at_61–62]. But "ultra vires review" is not "an easy end-run around the limitations of" other statutory review provisions, *NRC*, 605 U.S. at 681, including the remedial limitations that Congress, in the Tucker Act, imposed on government contract disputes like these.

Even if the Tucker Act somehow did not apply to plaintiffs' confusing ultra vires claims, then APA review would be available. Just as "[p]residential action may be reviewed through APA challenges to final agency action by [others] implementing the President's directives where such review is not otherwise precluded," *Global Health Council v. Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025), any decisions by DOGE that flowed through to the final decisions could be reviewed through challenges to the ultimate NEH actions. In fact, plaintiffs have challenged NEH's terminations under the APA in this very case. As noted above, plaintiffs are not entitled to APA relief on

their arbitrary-and-capricious claim in this case because the Tucker Act requires that claim be brought in the Court of Federal Claims. But for purposes of foreclosing ultra vires review, the availability of any "alternative procedure for review," whether it be the Tucker Act or APA, "foreclose[s] the grantees' ultra vires claim." *Id.* at 21 n.18.

**B.** Plaintiffs also cannot come close to satisfying the ultra vires standard even if they are thought to have any avenue for review of claims of this kind. Unlike the Tucker Act claim plaintiffs chose not to bring, and the APA claim that Congress withheld, an ultra vires claim requires showing more than that agency action "does not comport with the law." *NRC*, 605 U.S. at 681 (quotation marks omitted). The agency's action must be both "entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.*; *see Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 27 (2d Cir. 2022) ("plainly … in excess" (quotation marks omitted)). Although plaintiffs must satisfy both of these criteria, they cannot satisfy either.

**1.** Plaintiffs have not shown that either DOGE or NEH acted entirely (or, indeed, at all) in excess of its delegated powers. White House officials obviously have authority to provide guidance and oversight to an executive agency, and NEH obviously has authority to terminate grants. Even on the district court's mistaken understanding that there might be such a thing as too much White House influence, any such concern could not rise to the level of a "plain" or "entire" overstep of authority.

DOGE officials never claimed or exercised any authority to terminate any grants. Instead, the grants here indisputably were terminated by NEH. Plaintiffs received letters bearing the signature of NEH Acting Chairman Michael McDonald stating that he was terminating their NEH grants. The district court did not question McDonald's authority to terminate the grants. Nor could the court plausibly have suggested that McDonald had not authorized the use of his signature. *See, e.g.*, [Dkt.276-3_at_35] (McDonald transcript) (testifying that he "approved the use of" his signature on the termination letters). Unrebutted evidence demonstrated that the people who carried out the ministerial acts of sending out the termination letters informed McDonald that they would "begin to execute" an agreed-upon set of terminations "with your permission" and that McDonald reviewed the termination letters and affirmatively approved their being sent. [Dkt.276-26_at_2, 276-28_at_3, Dkt.276-29_at_3]; *see also* [Dkt.276-2_at_60] (Fox transcript) (explaining that McDonald "did not feel confident in the timeline of getting notices out" so he "wanted" Fox "to do it for him"). And there can be no serious argument that McDonald cannot be regarded as having effectuated the terminations because he did not personally engage in the ministerial task of sending out the emails; agency heads frequently receive assistance with drafting correspondence and with ministerial tasks, and that has never been thought to invalidate their actions. The district court's extended discussion of how DOGE officials themselves had no authority to terminate the grants is therefore beside the point.

The district court also objected to the process by which it was decided which grants would be terminated, a process in which the court believed that DOGE had undue influence. *See* [Dkt.291_at_72–83]. The court cited no authority for the proposition that a district court can properly probe the decision-making process within the Executive Branch in this fashion. *See, e.g.*, *Morgan v. United States*, 304 U.S. 1, 18 (1938) ("[I]t was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions … ."). But in any event, the district court's analysis was wrong. At bottom, it amounts to an assertion that it was somehow improper for White House officials to provide policy direction to an Executive Branch agency. The Supreme Court has made clear, however, that constitutional problems may arise if federal agencies act with too little oversight from the President, not too much. *See, e.g.*, *Trump v. Slaughter*, 146 S. Ct. 2283, 2303 (2026) (Federal "agencies that are insulated from presidential control" are "precisely the problem." (quotation marks omitted)). Because Acting Chairman McDonald understood that he had been "given instructions by the President to cooperate with DOGE in its work," [Dkt.276-3_at_20], he acted appropriately, and not ultra vires, in doing so.

Once again, the district court's long discussion of the degree to which DOGE personnel influenced decisionmaking is beside the point. Even if the NEH Acting Chairman felt that he effectively had no choice but to follow direction from White House officials in carrying out his functions—although the record reflects that he acted independently of DOGE personnel on individual grants, *see, e.g.*, [Dkt.276-

25_at_23, 31, 36, 83, 86–87]—that would not suggest that anything was amiss, much less so clearly amiss as to satisfy the ultra vires standard.

Consider a simple hypothetical: if the President calls a Cabinet Secretary and asks the Secretary to take a particular list of actions, and the Secretary then takes the actions, those actions are still *the Secretary's* actions. There would not be an ultra vires claim that the Secretary had not in fact acted because the President had determined the list of actions. This basic point would not change if the request came not from the President but from one of the President's advisors, with whom the President directed the Cabinet Secretary cooperate. Nor would the possibility that the Secretary felt that she had no realistic ability to resist the request, perhaps because she perceived an explicit or implicit threat that she would be fired if she chose not to comply (and thus colloquially described the decision as being made by the President or others in the White House). Similarly here, the degree to which DOGE instigated, influenced, or caused the Acting Chairman to terminate particular grants is irrelevant. What matters is that the Acting Chairman was the one who terminated the grants.

**2.** On the second point, plaintiffs have not identified any "*specific prohibition* in a statute" that the grant terminations violated. *NRC*, 605 U.S. at 681 (quotation marks omitted). In fact, there is no statutory violation in sight. As the district court previously acknowledged, "[t]he statute does not contain any express language about who can terminate awards." [Dkt.116_at_68] (preliminary injunction opinion). That understates the problem: Because plaintiffs' argument, in substance, is that DOGE

exercised undue influence over the process, plaintiffs would need to find a statutory provision about the process that may be used for the Acting Chairman to determine which awards to terminate. They have not identified any provision remotely like that, and for the reasons discussed above, a statute that purported to limit the White House's influence over a federal agency would be constitutionally suspect.

The district court read the requirement for a specific prohibition out of the ultra vires standard. The court concluded that it was enough that "Congress conferred no authority on DOGE." [Dkt.291_at_67]. As discussed above, that conclusion is irrelevant because DOGE did not claim any authority to terminate grants. But even setting that aside, a lack of express authorization is not the same thing as a specific prohibition, and only the latter triggers ultra vires review. *NRC*, 605 U.S. at 681; *Yale New Haven Hosp.*, 56 F.4th at 27. The district court's sole authority for dispensing with the specific-prohibition requirement was a single district-court order denying a motion to dismiss, [Dkt.291_at_67] (citing *American Fed'n of Lab. v. Department of Lab.*, 778 F. Supp. 3d 56, 89 (D.D.C. 2025)), without accounting for the fact that the cited district court had since corrected its own error and granted summary judgment to the government, concluding that "DOGE is entitled to summary judgment because plaintiffs do not identify a specific, clear, and mandatory provision … that DOGE acted … contrary to." *American Fed'n of Lab. v. Department of Lab.*, No. 25-339, 2026 WL 879518, at *24 (D.D.C. Mar. 31, 2026).

Although the district court referenced 20 U.S.C. § 956(c), [Dkt.291_at_71], the court elsewhere acknowledged that the cited statute "address[es] the award of grants, not their termination," [Dkt.291_at_70]; *see also infra* p. [32]. Any reliance on that provision would therefore be misplaced: A decision to terminate a grant cannot constitute a clear violation of a statutory provision that has nothing to do with grant termination. And in any event, that is not the claim plaintiffs asserted. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (discussing party-presentation principles).

**3.** Plaintiffs, for their part, argued that they did not need to meet the "entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" portion of the ultra vires standard, *NRC*, 605 U.S. at 681, because they say their claims state a constitutional violation. *See* Dkt. 247, at 32. But plaintiffs have not identified any constitutional provision that specifically prohibits White House officials from providing guidance to federal agencies (if anything, Article II says the opposite, *cf. Slaughter*, 146 S. Ct. at 2310). And even if plaintiffs were thought to have some sort of claim that a violation of statutory authority occurred—although it is entirely unclear what statute or how—in *Dalton v. Specter*, 511 U.S. 462 (1994), "the Supreme Court considered and rejected the argument that 'whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine.'" *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026). Courts have repeatedly rejected attempts to avoid the ultra vires standard by framing complaints as

"constitutional claims" that merely "assert that because executive officials and agencies violated statutes, they also violated the Constitution." *Id.*

## II. In Selective Grant Programs, The Government Can Subsidize Particular Viewpoints Without Violating The First Amendment.

**A.** The Supreme Court has long been clear that the First Amendment provides the government significant flexibility when it acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it. In its sovereign capacity, the government generally may not regulate speech based on viewpoint. *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026). But the government may itself promote favored viewpoints, including by "disburs[ing] public funds to private entities." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Accordingly, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). When the government engages in such selective funding, it "has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.*

Thus, *Rust* held that when awarding competitive grants for family-planning programs, the government could decline to fund programs that encouraged abortion as a method of family planning while funding those that encouraged carrying a

pregnancy to term. *See* 500 U.S. at 192–200. Likewise, *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), held that when awarding competitive grants to artists, the government could consider "general standards of decency and respect." *Id.* at 576 (quotation marks omitted); *see id.* at 580–88. Relying on *Rust*, the Court in *Finley* explained that because the government "has wide latitude to set spending priorities," it "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587–88. Such a "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983). Indeed, considering viewpoint in the competitive-funding context is unavoidable: "[I]t would be impossible to have a highly selective grant program without denying money to a large amount of constitutionally protected expression." *Finley*, 524 U.S. at 585 (quotation marks omitted).

Just as the First Amendment permits the government to award highly competitive artistic grants based on the viewpoints of decency and respect, and highly competitive family-planning grants based on viewpoints opposing abortion, so too does the First Amendment permit terminating highly competitive NEH grants based on opposition to the viewpoints of the DEI projects at issue here. The general requirement of viewpoint neutrality does not require taxpayers to continue funding projects that the government concludes no longer serve the public interest, even if

that conclusion is based in part on the viewpoint furthered by the projects. *Finley*, 524 U.S. at 588; *Rust*, 500 U.S. at 193.

**B.** The relevant limitation is that the government may not "*leverage* its power to award subsidies … into a penalty on disfavored viewpoints" or "manipulate[ subsidies] to have a *coercive* effect" on otherwise-protected speech. *Finley*, 524 U.S. at 587 (emphases added) (quotation marks omitted). Thus, as the words "leverage" and "coercive" indicate, the government may not condition grants or subsidies on the recipient's engaging or refraining from engaging in expressive conduct "that [is] separate and independent from the project that receives … funds," *Rust*, 500 U.S. at 196. Such a "funding condition can result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc. (AOSI)*, 570 U.S. 205, 214 (2013).

The "relevant distinction," therefore, "is between conditions that define the limits of the government spending program," which do not present constitutional concerns, and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *AOSI*, 570 U.S. at 214–15. For example, while the government may prohibit federal funds "from being used 'to promote or advocate the legalization or practice of prostitution or sex trafficking,'" it may not "demand[] that funding recipients adopt—as their own"—a "'policy explicitly opposing prostitution and sex trafficking.'" *Id.* at 208, 217–18.

This case falls easily in the former, permissible category. The government chose to stop funding research that advanced environmental justice, gender ideology, or DEIA. If the government had instead refused to provide any funding to entities that engaged in those activities using their own funds—assuming those activities constituted protected expression—this case would implicate the constitutional rules that apply when the government "seek[s] to leverage funding" to limit or penalize "speech outside the contours of the program itself." *AOSI*, 570 U.S. at 214–15. But the government "does not 'penalize'" institutions that choose to do DEI research, "or deny them the right to" do that research; it has merely made a constitutionally permissible "decision not to subsidize their doing so." *United States v. American Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion).

**C.** The district court's basis for rejecting the application of those precedents was not entirely clear, but (again) appears to be connected to its perception that there was something improper about DOGE's involvement and influence. The court acknowledged that a "*Regan*-style refusal … to subsidize a category of activity" was permissible—but said only if it was done "by Congress." [Dkt.291_at_104]; *see* [Dkt.291_at_99–100]. And the court acknowledged a "*Rust*-style definition of program scope" to exclude activities expressing a certain viewpoint was also permissible, but added that it must be "a *statutorily* authorized agency implementing an express *statutory* funding limitation." [Dkt.291_at_104] (emphases added); *see* [Dkt.291_at_100]. It agreed that *AOSI* clarifies that the government can decide

which viewpoints its programs fund, but cannot base funding on viewpoints expressed outside government programs. [Dkt.291_at_102]. But in the district court's view, outside the program does not mean outside of the *government-funded* work, but rather means outside of a "*congressionally* defined" program. [Dkt.291_at_102] (emphasis added). The problem—in the district court's view—is that "Congress enacted no … statutory limitation for DOGE – or anyone else – to implement." [Dkt.291_at_101].

But the district court cited no authority for the extraordinary proposition that the government's compliance with the First Amendment depends on whether the action is taken by Congress or the same action is taken by the Executive. No such distinction is found in *Regan*, or *Rust*, or *AOSI*. *Rust*, in fact, was a challenge to "regulations," not statutes. 500 U.S. at 192. *Regan* cited *Cammarano v. United States*, 358 U.S. 498 (1959), as the standard for when decisions not to subsidize activity cross the line into suppression of dangerous ideas, 461 U.S. at 548, and *Cammarano* also involved regulations. 358 U.S. at 526–29. *AOSI* turned on whether the government considered how grant recipients speak on their "own time and dime," which is not affected by which part of the government acts. 570 U.S. at 218. This Court too has applied *Regan*, *Rust*, and *AOSI* to executive action, without any suggestion that executive action is subject to a different standard than Congressional action. *See Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 224, 228–30 (2d Cir. 2021) (upholding SBA regulations excluding strip clubs from COVID-era program).

It would be particularly atextual for the First Amendment to apply more stringently to the Executive Branch which—unlike Congress—is "omitted from the express language of the First Amendment." *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972); *see* U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech … .). There is no dispute that Executive Branch action can be challenged under the First Amendment, but there is no basis for suggesting that the First Amendment imposes more stringent restrictions on the branch of government that it does not expressly mention.

Consistent with the district court's premise that the First Amendment's restrictions turn on the existence of a statute, the court repeatedly suggested that the terminations might have given insufficient weight to (or even conflicted with) the statutory criteria about how NEH funds grants. [Dkt.291_at_87, 90–91, 101, 103, 107–108]; *see* 20 U.S.C. § 956. But even under the district court's flawed reasoning that affirmative statutory authorization is required, statutory prohibitions would not be relevant to the First Amendment claim. And plaintiffs are not bringing a claim that the grant terminations violated the statutory criteria.[2] While these provisions

---

[2] Such an APA claim that the agency considered the wrong factors in terminating the grants would be barred by the Tucker Act. *See Department of Educ.*, 604 U.S. at 650; *NIH*, 145 S. Ct. 2658. And plaintiffs do not assert these as an ultra vires claim, which would also fail. The provisions also would not support class-wide relief, as it would require individualized inquiry to determine which grants are affected by any statutory provisions.

were plainly not violated here (they do not even apply to terminations), the relevant point is that they have no relevance whatsoever to the First Amendment question.

**D.** While other parts of the district-court opinion hinted that public-forum principles may apply and require viewpoint neutrality, the district court did not rely on that reasoning. *Compare* [Dkt.291_at_85–86] (discussing *Rosenberger*, 515 U.S. at 829–30), *with* [Dkt.291_at_86–105] (applying First Amendment to this case). In any event, this case plainly does not involve any public forum, and the Supreme Court has squarely rejected *Rosenberger*'s application to selective grant programs.[3] *Finley*, 524 U.S. at 586 ("the competitive process according to which the grants are allocated" "distinguish[es] this case from *Rosenberger*").

## III. Plaintiffs' First Amendment Political-Association Claims Fail For Multiple Reasons.

The district court's analysis of the political-association claims fares no better. NEH sought to terminate grants because the content of the research did not align with the Trump Administration's priorities, and understandably determined that the first place to look for such grants was among grants awarded during the Biden Administration. There is no conceivable basis to conclude that NEH's actions were

[3] Departing from the reasoning of the district court here by relying heavily on *Rosenberger*, the Ninth Circuit recently held that plaintiffs were likely to succeed on the merits of a First Amendment claim in a similar case. *See Thakur v. Trump*, 176 F.4th 1187, 1199–204 (9th Cir. 2026) (per curiam). The Ninth Circuit's *Thakur* decision is wrong, as the government's recently filed petition for certiorari explains. *See* Petition for a Writ of Certiorari, *Trump v. Thakur*, No. 26-210 (U.S.) (Aug. 18, 2026).

premised on the grantee's association with the Biden Administration, where the only "association" was the receipt of grants under a set of policies about which the new administration had concerns. And in any event, the only grants that were *not* terminated were issued during the Biden Administration, which conclusively disproves any associational-discrimination claim.

**A.** As the district court previously recognized, a claim that termination decisions were impermissibly based on political affiliation turns on whether there was a "withdrawal of a benefit because of the recipient's association with a political party." [Dkt.116_at_60] (preliminary injunction opinion); *see Branti v. Finkel*, 445 U.S. 507, 515 (1980) (holding the government cannot "deny a benefit to a person because of his constitutionally protected … associations"). But the record is devoid of any evidence that NEH considered the political association of any grantee. Instead, the evidence consistently shows that NEH considered the content of the project, not the political associations the researchers had on their own time. *See supra* pp. [6–9].

**B.** Plaintiffs point only to evidence that, early in the process, the agency focused on grants awarded since January 21, 2021. But that has nothing to do with the political affiliation of the grantee (unless the Biden Administration was improperly prioritizing grant applicants who politically supported it, a claim that has not been advanced here and would provide its own justification for terminating such grants). Instead, the incoming Trump Administration's understandable view was that grants

would be more likely to conflict with President Trump's priorities if they were issued under a different President who had markedly and deliberately different policies.

The specifics make the flaws in the claims even more prominent. The President was concerned about grants promoting DEI, and the Biden Administration had an express policy promoting DEI. *See, e.g.*, Exec. Order No. 13985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 25, 2021) ("It is therefore the policy of [the Biden] Administration that the Federal Government should pursue a comprehensive approach to advancing equity … ."). And NEH leadership confirmed that DEI was an agency priority during the Biden Administration. *See* [Dkt.276-4_at_7] (Wolfson transcript) (explaining that "the main priorities" for NEH under the Biden Administration were "strengthening democracy, addressing our changing climate, and … advancing equity for racially underserved groups"). Of course a search for DEI grants would begin with such grants, not because of political animus but because of policy differences. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.").

**C.** Even apart from that fatal legal flaw in the district court's theory, there is a fatal factual flaw. To support its erroneous conclusion, the court pointed to evidence that some of the earliest work identifying grants for termination focused on Biden-era grants. *See* [Dkt.291_at_106]. But reviewing those grants *first* is not worse

treatment if all grants were ultimately reviewed. And there is plenty of evidence that they were. DOGE members explained that they reviewed "all active grants." [Dkt.276-9_at_2]. Older, pre-Biden grants were clearly reviewed, as they were all terminated. It is hard to see how the government could have discriminated against grants issued during the Biden Administration when the only grants that were retained were issued during the Biden Administration.

## IV. Plaintiffs' Equal Protection Claims Fail For Multiple Reasons.

Plaintiffs' Equal Protection claims also fail. As discussed, a substantial part of the government's project was to terminate grants that promote DEI. Doing so is not a race-based classification, and certainly no less permissible than any prior efforts to encourage grants that promote DEI. And terminating those grants is rationally related to the President's new priorities.

**A.** Distinguishing grants that conduct generally applicable or colorblind research from those that focus on or prioritize particular subsets of the community (*e.g.*, specific racial groups) does not warrant heightened scrutiny. It would be extraordinary to suggest that the government is compelled to fund research that draws explicit racial lines or focuses on racial issues, rather than other projects that might be worthy of funding. The Constitution generally discourages, rather than encourages, the use of explicit racial classifications, and attempting to minimize government funding of projects that use them is plainly consistent with equal-protection principles.

"At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens 'as individuals, not "as simply components of a racial, religious, sexual or national class."'" *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation omitted). The government should avoid "endors[ing] race-based reasoning and the conception of a Nation divided into racial blocs," which "contribut[es] to an escalation of racial hostility and conflict." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 746 (2007) (citation omitted). Thus, the government can choose not to fund research that "divid[es]" the world into "racial blocs" or similar subgroups. *Id.* The government does not violate the "colorblind Constitution," *Allen v. Milligan*, 146 S. Ct. 1377, 1380 (2026) (per curiam), by funding colorblind research rather than research that analyzes its topic through a lens of race. The same logic applies to research that views its topic through a lens of sex, religion, or any other protected characteristic.

That is sufficient to defeat any argument that targeting DEI for termination violates equal-protection principles, but there is also a more fundamental problem. There is no argument in this case that any project was selected for termination based on any benefit or burden that would be placed on people of any particular race, religion, or ethnicity. *Cf.* U.S. Const. amend. V ("nor shall any person … be deprived of … due process"). Plaintiffs have not contended, for example, that any analysis was done based on the race of the grantee. Nor is there any allegation that grants were selected for termination as pretext for intentional discrimination against people of any

particular race. If anything, the government terminated some grants that explicitly favored one racial group or another, and terminating those constitutionally suspect grants cannot plausibly violate the Constitution.

The primary argument appears to be that grants about certain topics were favored over grants about other topics. That is fundamentally a distinction based on the content or viewpoint of the grant, rather than based on race or any other protected characteristic of the grant recipient. The cases upon which plaintiffs relied underscore the absence of any support for the idea that, for example, a decision about whether to fund a study of Martin Luther King or Mahatma Gandhi is a race-based classification subject to strict scrutiny. Plaintiffs relied on the line of cases beginning with *Loving v. Virginia*, 388 U.S. 1 (1967), which held that prohibitions on interracial marriage are subject to strict scrutiny, and continuing through *Palmore v. Sidoti*, 466 U.S. 429 (1984), which held that a parent could not be divested of custody of her child because of her remarriage to a person of a different race. Those cases, in which the government sought to provide or withhold benefits based on an individual's race, have little bearing on the issues here.

In addition to having no precedential support, extending strict scrutiny to research topics would have radical consequences. The level of scrutiny does not depend on whether the classification works to the benefit or detriment of historically disadvantaged groups. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986) ("The Court has recognized that the level of scrutiny does not change merely because

the challenged classification operates against a group that historically has not been subject to governmental discrimination."). Thus, if opposition to racial-group-focused research were subject to strict scrutiny, so too would support for that same research, with potentially significant consequences. For example, governmental support has long helped advance "Black history month." *See, e.g.*, Libr. Of Cong., *Black History Month*, https://perma.cc/PAS7-LFYF. In addition, if *terminating* these grants based on their subject matter were held to violate equal protection, that would necessarily imply that *awarding* the grants in the first place also violated equal protection, a holding neither plaintiffs nor the district court seemed to embrace.

In addition to misunderstanding the relevant legal inquiry, the district court got the facts wrong. According to the court, there were "systematic disparities in how the Government treated projects involving different national origins and genders," based on the district court's conclusion that NEH "terminated grants involving countries in Africa, Asia, or South America, while retaining grants involving Western European subjects." [Dkt.291_at_113]. That conclusion was not based on any meaningful analysis of the grants that were ultimately terminated or retained, but rather on the court's assessment of early efforts to identify grants that might be worthy of termination.

To prepare for their first meeting with NEH leadership, DOGE personnel created a spreadsheet of grants that appeared troublesome from the perspective of inconsistency with the President's policy of not funding DEI. That list,

unsurprisingly, was slanted toward grants that involved the sorts of groups that would plausibly have been the beneficiaries of the DEI policies that the President directed his subordinates to try to eliminate. And it was generated using search terms that sought to identify DEI-related grants. It would have made no sense to use search terms related to Western Europeans to try to identify grants that implicated the Executive Order about DEI, and that common-sense fact does not reflect discrimination based on any protected characteristic.

That spreadsheet was, in any event, a "very preliminary exercise," and ultimately was "not used in the context of deciding which grants to keep or not." [Dkt.276-2_at_49, 56–57] (Fox transcript). A review of the actual grant determinations, which should be what actually matters, further undermines the district court's conclusions. *Cf. Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 67 (2004) (explaining the focus of APA review should be whether agency action complies with law, not "the manner and pace of agency compliance" or "day-to-day agency management").

NEH terminated all but 42 grants. Among the grants retained were projects to "[d]ocument[] 20th-century American Jewish Philanthropy and Public Service," publish volumes about "Freedmen" and "Emancipation," and fund an exhibition of "the history of Black Revolutionaries in New Hampshire." [Dkt.276-26_at_5–6]. The retained grants do not support an inference that research focused on black or

Jewish communities (or any other protected characteristic) were treated worse than other research.

**B.** The actions here readily satisfy the rational-basis standard. President Trump's Executive Order explained that the Biden Administration prioritized DEI through "a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, 'Advancing Racial Equity and Support for Underserved Communities Through the Federal Government.'" Exec. Order No. 14151, § 1, 90 Fed. Reg. at 8339. "Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted 'Equity Action Plans' to detail the ways that they have furthered DEIs infiltration of the Federal Government." *Id.* Reflecting his administration's differing values, President Trump announced on his first day in office that the emphasis on DEI adopted by the Biden Administration "ends today." *Id.* Agencies were specifically instructed to review existing grants to identify grants that conflicted with the new administration's priorities. *See supra* pp. [6–7].

Identifying DEI terminology or grants that focus on particular racial or other subgroups was a reasonable way to accomplish this goal. The district court nonetheless concluded the terminations failed rational basis because it said using search terms such as "BIPOC" and "LGBTQ," *see* [Dkt.291_at_111], was not rationally related to identifying grants that advanced DEI. [Dkt.291_at_119–20].

Searching for DEI terminology is clearly related to identifying DEI grants.[4] Similarly, identifying projects that focus on any particular race rationally involves searching for racial terms. For example, identifying grants like the one that would "foreground works of art by Black, Indigenous, and other artists of color and by women," [Dkt.248-24_at_14], involves spotting the terms "Black" or "Indigenous" and considering how the grant is using racial terminology. Nothing about searching for those terms suggests (as the district court said) "a bare … desire to harm a politically unpopular group." [Dkt.291_at_122] (alteration in original) (citation omitted). The search terms are a reasonable implementation of the desire explained in the Executive Orders: to end government funding of DEI research.

Finally, the district court acknowledged that "rational basis review does not permit courts to" sit as a "superlegislature" and "judge the wisdom, fairness or logic of [the Executive's] choices." [Dkt.291_at_122-23] (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (alteration in original). The district court's only explanation for how its rational-basis holding did not conflict with this principle was to say that this case involved "suspect lines" and "'odious' criteria," [Dkt.291_at_123], but the implication that the stated rationale was a pretext for discrimination against a protected class is mistaken for the reasons discussed above and in any event plays no

---

[4] *See, e.g.*, Racial Equity Tools Glossary, *Racial Equity Tools*, https://www.racialequitytools.org/glossary, https://perma.cc/E9BM-8GYR (listing common DEI terminology, including search terms the district court criticized).

role in rational-basis review, which is satisfied whenever there is any rational justification for the government action.

## V. Class-wide Relief Was Improper.

For the reasons stated above, the district court's injunction should be reversed in its entirety. But the court exacerbated its errors—in addition to highlighting the flaws in its merits analysis—by certifying a class and providing sweeping relief for every grant that was terminated.

"The key to [a Rule 23](b)(2) class is … the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Thus, the fundamental premise of the district court's class-certification determination was its view that "[p]laintiffs challenge a single, top-down policy applied uniformly across the class." [Dkt.291_at_133]. That conclusion is at odds with both the facts and the legal theories accepted by the district court.

For example, many of the terminated grants were identified by NEH staff, before DOGE had any substantive involvement, as implicating the President's Executive Orders. *See supra* p. [7]; [Dkt.248-6]. While DOGE also prepared a list of grants it considered to implicate DEI, McDonald's email authorizing the terminations explains that for the grants NEH had flagged as implicating DEI, he was terminating them in reliance on NEH's DEI list, not DOGE's. [Dkt.276-15_at_2]. It is therefore unclear why the district court's analysis of the ultra vires claim would apply to grants

that NEH identified as implicating DEI (regardless of whether DOGE agreed with NEH's classification). Illustrating the problem, the ACLS plaintiffs themselves described the "DEI rationale" for many of their grants as "NEH identified DEI involvement," *see* [Dkt.248-24]; but the district court nonetheless granted relief for those grants based on an ultra vires theory.[5] And as noted above, the district court's First Amendment analysis was premised in part on its view that DOGE overstepped its bounds, which again would not apply uniformly to all members of the class.

Similarly, the district court's analysis of the political-association claims was premised on its view that NEH's review improperly focused on Biden-era grants when it started its analysis. But the class was not limited to grants that were flagged at that early stage by NEH, so the court's analysis does not apply across the board.

The district court's equal-protection analysis similarly required individualized considerations. Some grants—like the one favoring artists from particular ethnic groups—plainly implicated DEI, while in other cases the district court second-guessed the government's determination that DEI was implicated. [Dkt.291_at_118]. To the extent the court's analysis was premised on the second-guessing, it would provide no basis for relief as to the grants that actually implicated DEI.

[5] The ACLS plaintiffs' members' grants are excluded from the Guild plaintiffs' certified classes. But the certified classes include a significant number of similar grants for which NEH identified the DEI involvement.

Further, although the district court's equal protection *analysis* focuses solely on DEIA, its class-wide *judgment* also encompasses climate-justice and gender-ideology grants, at least some of which would not be subject to strict scrutiny even on the district court's flawed theory. The American Historical Association, for example, had funding terminated for a conference drawing on history to help "understand[] what differentiates current emissions-driven climate change from what came before." [Dkt.248-12_at_199]. Because of its focus on climate change, this grant was flagged as implicating the President's Executive Orders—for which the term "DEI" was a shorthand—even though it has nothing to do with race or any other protected class. [Dkt.248-3_at_9]; *see* [Dkt.248-12_at_199]. Similarly, the district court engaged in no analysis of whether gender ideology is a suspect classification, a proposition that is, at a minimum, subject to considerable doubt. *See West Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356, 2379 (2026) ("Members of this Court … have concluded that classifications based on transgender status or gender identity should receive only deferential rational basis review and not intermediate or other heightened scrutiny.").

Even the ACLS plaintiffs recognized that not every grant flagged for DEI—the primary criteria for the DEI Subclass—should be treated the same with regard to equal-protection challenges. Those plaintiffs identified a subset of 110 grants for which they asserted equal-protection claims. *See* [Dkt.291_at_113]; *see also ACLS* Dkt. 248-24. Notably, this list omitted many of the ACLS plaintiffs' grants that had been marked as DEI, and instead focused on DEIA grants rather than environmental-

justice and gender-ideology grants. For example, they did not assert an equal-protection claim based on the American Historical Association's climate-change grant. The Guild plaintiffs, however, made no similar attempt to narrow their equal protection claims to DEIA grants, and the district court lumped gender-ideology grants and environmental-justice grants together in the DEI Subclass.

These class-certification errors are of a piece with the errors in the district court's merits analysis. In addition to highlighting the need for outright reversal, they provide an independent basis to vacate the district court's order, which was plainly overbroad.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JAMES M. MCDONALD
*United States Attorney for the*
*Southern District of New York*
*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY

*s/ Derek Weiss*
DEREK WEISS
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,033 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

# ADDENDUM

# TABLE OF CONTENTS

20 U.S.C. § 956(a)–(c) ........................................................................................................A1

**20 U.S.C. § 956(a)-(c)**

**§ 956. National Endowment for the Humanities**

**(a) Establishment**

There is established within the Foundation the National Endowment for the Humanities.

**(b) Chairperson of the Endowment; appointment, term, reappointment; vacancy; expiration of term**

(1) The Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate.

(2) The term of office of the Chairperson shall be four years, and the Chairperson shall be eligible for reappointment. The provisions of this paragraph shall apply to any person appointed to fill a vacancy in the office of the Chairperson. Upon expiration of the Chairperson's term of office the Chairperson shall serve until the Chairperson's successor shall have been appointed and shall have qualified.

**(c) Functions of the Endowment; publications; traditionally underrepresented recipients of financial assistance**

The Chairperson, with the advice of the National Council on the Humanities (hereinafter established), is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to—

(1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

(2) initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities; any loans made by the Endowment shall be made in accordance with terms and conditions approved by the Secretary of the Treasury;

(3) initiate and support training and workshops in the humanities by making arrangements with institutions or individuals (fellowships awarded to individuals under this authority may be for the purpose of study or research at appropriate nonprofit institutions selected by the recipient of such aid, for stated periods of time);

(4) initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

(5) foster international programs and exchanges;

(6) foster the interchange of information in the humanities;

(7) foster, with groups, education in, and public understanding and appreciation of the humanities;

(8) support the publication of scholarly works in the humanities;

(9) insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

(10) foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

In the case of publications under clause (8) of this subsection such publications may be supported without regard for the provisions of section 501 of title 44 only if the Chairperson consults with the Joint Committee on Printing of the Congress and the Chairperson submits to the Committee on Labor and Human Resources of the Senate and the Committee on Education and Labor of the House of Representatives a report justifying any exemption from such section 501. In selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under this subsection, the Chairperson shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented.

[Subsections (d) through (m) omitted)]