# Nos. 26-1829 (L), -1832 (CON), -1996 (XAP)

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

Nos. 26-1829 (L), 26-1996 (XAP)

AMERICAN COUNCIL OF LEARNED SOCIETIES, AMERICAN HISTORICAL ASSOCIATION, AND MODERN LANGUAGE ASSOCIATION,
*Plaintiffs-Appellees-Cross-Appellants*,

*v.*

MICHAEL MCDONALD, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE NATIONAL ENDOWMENT FOR THE HUMANITIES; NATIONAL ENDOWMENT FOR THE HUMANITIES; UNITED STATES DOGE SERVICE; AMY GLEASON, IN HER OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE UNITED STATES DOGE SERVICE; NATE CAVANAUGH, IN HIS OFFICIAL CAPACITY AS AN EMPLOYEE OF THE U.S. DOGE SERVICE OR THE GENERAL SERVICES ADMINISTRATION; AND JUSTIN FOX, IN HIS OFFICIAL CAPACITY AS AN EMPLOYEE OF THE U.S. DOGE SERVICE OR THE GENERAL SERVICES ADMINISTRATION
*Defendants-Appellants-Cross-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York (McMahon, J.)

**PAGE PROOF BRIEF FOR PLAINTIFFS-APPELLEES**

*CAPTION FOR NO. 26-1832 (CON) AND COUNSEL INFORMATION ON INSIDE COVER*

No. 26-1832 (CON)

THE AUTHORS GUILD; WILLIAM GOLDSTEIN; ELIZABETH KADETSKY; VALERIE ORLANDO; KATALIN BALOG; BENJAMIN HOLTZMAN; LEE JASPERSE; AND NICOLE JENKINS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED
*Plaintiffs-Appellees*,

*v.*

NATIONAL ENDOWMENT FOR THE HUMANITIES; MICHAEL MCDONALD, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE NATIONAL ENDOWMENT FOR THE HUMANITIES; UNITED STATES DOGE SERVICE; AMY GLEASON, IN HER OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE UNITED STATES DOGE SERVICE; NATE CAVANAUGH, IN HIS OFFICIAL CAPACITY AS AN EMPLOYEE OF THE U.S. DOGE SERVICE OR THE GENERAL SERVICES ADMINISTRATION; AND JUSTIN FOX, IN HIS OFFICIAL CAPACITY AS AN EMPLOYEE OF THE U.S. DOGE SERVICE OR THE GENERAL SERVICES ADMINISTRATION
*Defendants-Appellants.*

---

Daniel F. Jacobson
John Robinson
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs in Nos. 26-1829 (L), 26-1996 (XAP)*

Jamie Crooks
Michael Lieberman
Amanda R. Vaughn
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street NW, Suite 304
Washington, DC 20004
jamie@fairmarklaw.com
michael@fairmarklaw.com
amanda@fairmarklaw.com
yinka@fairmarklaw.com

*Counsel for Plaintiffs and the Class in No. 26-1832 (CON)*

November 9, 2026

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees American Council of Learned Societies, Modern Language Association, American Historical Association, and The Authors Guild do not have any parent corporations and no publicly held corporation owns 10% or more of their stock. The other Plaintiffs-Appellees are individuals.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 4

I. Statutory Background ........ 4

II. Factual Background ........ 5

III. Prior Proceedings ........ 14

SUMMARY OF ARGUMENT ........ 16

STANDARD OF REVIEW ........ 20

ARGUMENT ........ 20

I. DOGE Terminated NEH Grants Without Legal Authority. ........ 20

II. The Grant Terminations Violated the First Amendment. ........ 35

A. The “DEI” Terminations Violated the First Amendment. ........ 35

B. The “Biden-Era” Terminations Violated the First Amendment. ........ 46

III. The Grant Terminations Violated Equal Protection. ........ 48

IV. The District Court Properly Certified a Class and Provided Classwide Relief. ........ 58

CONCLUSION ........ 62

## TABLE OF AUTHORITIES

### Cases

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) .......... 49

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) .......... 54

*AFL-CIO v. Dep't of Lab.*,
836 F. Supp. 3d 137 (D.D.C. 2026) .......... 27, 28, 29

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .......... 42, 43, 44

*All. for Open Soc'y Int'l, Inc. v. Agency for Int'l Dev.*,
651 F.3d 218 (2d Cir. 2011) .......... 43

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 48

*Am. Hist. Ass'n v. Trump*,
835 F. Supp. 3d 1 (D.D.C. 2026) .......... 30

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) .......... 34

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 59

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 59

*Amidon v. Student Ass'n*,
508 F.3d 94 (2d Cir. 2007) .......... 37, 40

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2022) .......... 20

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) .......... 54

*Branti v. Finkel*,
445 U.S. 507 (1980) .......... 19, 46

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 46

*Chiles v. Salazar*,
607 U.S. 627 (2026) .......... 18

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .......... 57, 58

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 16, 28, 29, 30

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) .......... 32

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) .......... 31

*Fund for Animals v. Kempthorne*,
538 F.3d 124 (2d Cir. 2008) .......... 28

*Graham v. Richardson*,
403 U.S. 365 (1971) .......... 49

*Greene v. United States*,
13 F.3d 577 (2d Cir. 1994) .......... 60

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) .......... 39, 48, 61

*Hudson Valley Freedom Theater, Inc. v. Heimbach*,
671 F.2d 702 (2d Cir. 1982) .......... 55

*Johnson v. California*,
543 U.S. 499 (2005) .......... 56

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) .......... 48

*Kusper v. Pontikes*,
414 U.S. 51 (1973).....46

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986).....28

*Larkin v. United States*,
177 Fed. Cl. 17 (2025).....32

*LeBlanc v. United States*,
50 F.3d 1025 (Fed. Cir. 1995).....31

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001).....36, 38, 40, 41, 42, 44, 45

*Louisiana v. Callais*,
608 U.S. 85 (2026).....54

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*,
811 F.3d 542 (2d Cir. 2016).....31

*Matal v. Tam*,
582 U.S. 218 (2017).....44

*Matusick v. Erie Cnty. Water Auth.*,
757 F.3d 31 (2d Cir. 2014).....55

*Nambiar v. Cent. Orthopedic Grp., LLP*,
158 F.4th 349 (2d Cir. 2025).....20

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998).....35, 36, 37, 38, 40

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025).....32

*Nevada Dep't of Hum. Res. v. Hibbs*,
538 U.S. 721 (2003).....49

*New Mexico v. Musk*,
824 F. Supp. 3d 80 (D.D.C. 2026).....34

*Newsom v. Trump*, – F.4th – ,
2026 WL 3180273 (9th Cir. Oct. 23, 2026)....................27

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025).................... 26, 28, 31

*Palmieri v. Lynch*,
392 F.3d 73 (2d Cir. 2004)....................52

*Palmore v. Sidoti*,
466 U.S. 429 (1984).................... 55, 57

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)....................54

*Perry v. Sindermann*,
408 U.S. 593 (1972).................... 36, 40

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983)....................41

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995).................... 35, 37, 41, 43

*Rust v. Sullivan*,
500 U.S. 173 (1991).................... 40, 41, 45

*SFFA v. Harvard*,
600 U.S. 181 (2023)....................57

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)....................44

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026)....................27

*Thakur v. Trump*,
163 F.4th 1198 (9th Cir. 2025)....................40

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026).................... 2, 18, 38, 40, 41, 43

*Turping v. United States*,
134 Fed. Cl. 293 (2017) ....................................................................31

*United States v. Brown*,
352 F.3d 654 (2d Cir. 2003) ....................................................................49

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ....................................................................35

*Wandering Dago, Inc. v. Destito*,
879 F.3d 20 (2d Cir. 2018) .................................................................... 37, 44

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012) ....................................................................49

*Yale New Haven Hosp. v. Becerra*,
56 F.4th 9 (2d Cir. 2022) ....................................................................34

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .................................................................... 29, 30

**Statutes**

20 U.S.C. § 951(6) ....................................................................4

20 U.S.C. § 953(c) ....................................................................5

20 U.S.C. § 956 ....................................................................4

20 U.S.C. § 956(c) .................................................................... 4, 34, 43

20 U.S.C. § 957(f) ....................................................................5

**Other Authorities**

Exec. Order No. 14151,
90 Fed. Reg. 8339 (Jan. 20, 2025) ....................................................................58

Exec. Order No. 14158,
90 Fed. Reg. 8441 (Jan. 20, 2025) ....................................................................5

Exec. Order No. 14222,
90 Fed. Reg. 11095 (Mar. 3, 2025) ....................................................................31

**Rules**

Fed. R. Civ. P. 23(b)(2) ........................................................................................59

**Constitutional Provisions**

U.S. Const. art. I § 8, cl. 18........................................................................................28

# INTRODUCTION

This case involves the unprecedented mass termination of grants at the National Endowment for the Humanities ("NEH") by two operatives from the Department of Government Efficiency ("DOGE"). Using ChatGPT, the DOGE operatives explicitly targeted grantees because of their disfavored viewpoints and political associations, and in many cases, because their projects involved persons of a particular race, ethnicity, religion, sex, or sexual orientation. The DOGE operatives have not denied these facts—they have proudly defended them, testifying for example that they terminated grants about the Holocaust and a massacre of African-Americans because they reflected "DEI," in that the grants focused on the "Jewish culture" and the "black" race. When the Acting Chair of NEH begged the DOGE operatives not to terminate these and many other awards, the operatives rejected him, saying that it was *their* decision which NEH awards to terminate.

On these shocking and undisputed facts, developed through extensive discovery, the district court correctly held that the terminations were unlawful several times over. The terminations violate the First Amendment. The two DOGE operatives, Justin Fox and Nate Cavanaugh, targeted grants they deemed to promote "DEI" viewpoints. Fox and Cavanaugh searched grant descriptions for "Detection Codes" like "Minorities," "Native," and "Gay," and they asked ChatGPT whether projects were "DEI" and adopted its answers wholesale. Fox and Cavanaugh also

targeted grants they viewed as associated with the Biden Administration, terminating them because of the grantees' connection to a political opponent.

Defendants do not dispute that they terminated grants because of their perceived viewpoints and political associations; they argue only that they were allowed to do so. They are wrong: when the government subsidizes private speech, it may not discriminate among grantees based on their viewpoints or political associations. Indeed, the Ninth Circuit has already considered many of these same terminations and concluded that they were "aimed at the suppression of viewpoints with which the government disagrees [and] likely violate[] the First Amendment." *Thakur v. Trump*, 176 F.4th 1187, 1203 (9th Cir. 2026) ("*Thakur II*"). Defendants offer no compelling reason to create a circuit split.

The terminations also violate equal protection. DOGE, with the help of ChatGPT, undisputedly designated grants as DEI and slated them for termination solely because the grants concerned members of a certain race, ethnicity, religion, sex, or sexual orientation. It is black-letter law that any government classifications based on race or other protected characteristics trigger strict or heightened scrutiny, which Defendants do not even try to meet. Defendants argue that their supposedly salutary motivations exempt the terminations from strict scrutiny, but the Supreme Court has repeatedly rejected that proposition over the last decade.

The terminations are unconstitutional for yet another, equally fundamental reason: DOGE had no authority to make these decisions. Defendants concede that DOGE had no statutory authority to terminate NEH grants, instead arguing that DOGE merely "recommended" terminations to the NEH Chair. But contrary to that revisionist history, Fox and Cavanaugh made the decisions themselves, expressly overruling objections from then-Acting NEH Chair Michael McDonald. The evidence on this point is undisputed and overwhelming, with McDonald telling Fox and Cavanaugh: "as you've made clear, it's your decision on whether to discontinue funding any of the projects on this list." DOGE selected which grants to terminate, decided to terminate them, and issued the termination notices. As NEH officials later confirmed to grantees, "DOGE did indeed cancel your award."

In the end, Fox and Cavanaugh, neither of whom had any experience in government, grantmaking, or the humanities, sidelined NEH leadership to terminate 1,400 grants and $150 million in humanities funding. They did not terminate the grants because of the work's quality or any improper use of federal funds. Indeed, each grant had survived months of merit-based, competitive peer review and had received the NEH Chair's final determination that it merited NEH's financial support and imprimatur. Fox and Cavanaugh terminated the awards because the projects expressed disfavored ideas, were associated with a political opponent, or concerned people of a certain race or other protected characteristics. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether DOGE officials acted unlawfully by terminating NEH grants without statutory or constitutional authority.

2. Whether the federal government violates the First Amendment when it terminates grants because the funded projects express disfavored viewpoints or are associated with a political opponent.

3. Whether the federal government violates the Fifth Amendment when it uses race, sex, religion, and other protected characteristics as criteria for terminating grants.

4. Whether the district court properly granted classwide relief.

## STATEMENT OF THE CASE

### I. Statutory Background

Congress created NEH in 1965 to support scholarship, education, and public engagement in the humanities. 20 U.S.C. § 956. Congress embedded viewpoint neutrality and support for a diversity of beliefs as mandates at the core of NEH's mission: the Act provides that the humanities "reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs of all persons and groups." *Id.* § 951(6). Congress directed the NEH Chairperson to "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.* § 956(c);

[Dkt.291_at_3–5].[1] And it forbade any federal "department, agency, officer, or employee" from exercising "any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any [grantee]." *Id.* § 953(c).

Congress placed expert judgment at the center of NEH's grant process. The Chairperson may make grants only "with the advice of the National Council on the Humanities." § 956(c); § 957(f); [Dkt.291_at_5–7]. NEH awards grants through highly competitive grant programs with varying qualifications or aims, including the Public Scholars program, the Fellowships program, the Summer Stipends Program, the Awards for Faculty at Historically Black Colleges and Universities program, and many more. Each named plaintiff (or its members), and each member of the class, received a prestigious NEH award through one of these grant programs. [Dkt.291_at_8–13].

## II. Factual Background

On his first day in office, President Trump established the "Department of Government Efficiency," or DOGE. *See* Exec. Order No. 14158, 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025). The Executive Order established the United States DOGE Service ("USDS") as a component of the Executive Office of the President, and also required each agency to establish a "DOGE Team" within the agency. *Id.* § 3. USDS

[1] District court docket citations are to No. 25-cv-3657.

and the agency DOGE teams were directed to work together, *id.*, and in practice they would all function as one unit (hereinafter, "DOGE"), with members of agency DOGE teams taking direction from and seeking legal advice from USDS. [Dkt.248-1_at_25, 26, 73].

Justin Fox and Nate Cavanaugh were members of the DOGE team through the General Services Administration ("GSA"). Before joining the Trump Administration, Fox and Cavanaugh had never worked in government, administered a grant, or evaluated humanities scholarship. [Dkt.291_at_17; Dkt.248-2_at_9; Dkt.248-1_at_12]. Both identified as members of DOGE's "Small Agencies Team," which existed, in Cavanaugh's words, to cut spending at "useless agencies." [Dkt.248-2_at_10, 12; Dkt.248-1_at_27; Dkt.291_at_17]. Fox understood his job to be "terminating grants." [Dkt.248-1_at_23]. Cavanaugh reported agency "savings," meaning grants and contracts terminated, to DOGE leadership every week. [Dkt.248-2_at_11]. In March 2025, DOGE leadership dispatched Fox and Cavanaugh to NEH. [Dkt.248-2_at_12]. Days before he first met NEH's leadership, Fox began sorting NEH's grants into the "Craziest Grants" and "Other Bad Grants." [Dkt.291_at_16, 18]. He used "Detection Codes" to identify such grants, including "BIPOC (Black, Indigenous, People of Color)," "Minorities," "Native," "Tribal," "Indigenous," "Immigrant," "LGBTQ," "Homosexual," and "Gay." [Dkt.291_at_18, 111; Dkt.248-9_at_25]. He did not use corresponding majority-

group terms, such as "white," "heterosexual," or "Caucasian." [Dkt.248-1_at_61-62].

Prior to DOGE's arrival, NEH staff had begun assigning ideological ratings to every grant awarded since January 2021, which Assistant Chair for Programs Adam Wolfson called the "start of the Biden administration." [Dkt.248-26_at_9]. Each grant was rated "high," "medium," "low," or "not applicable" ("N/A") for DEI, DEIA, environmental justice, and gender ideology, to identify grants "for potential termination." [Dkt.248-4_at_2; Dkt.248-3_at_7, 16; Dkt.291_at_16]. The ratings turned on what the funded scholarship discussed and the viewpoints it espoused; "the Government makes no attempt to argue" that these ratings were based on the grants' "humanistic merit or statutory criteria." [Dkt.291_at_107]. A book about Black and Indigenous farmers, for example, was rated "high" because it "discusses racial discrimination and land appropriation from Indigenous people." [Dkt.248-6_at_10].

When DOGE arrived, Fox developed his own list of NEH grants to terminate. He included some of the grants NEH staff had identified as high, medium, or low for DEI, but also separately deployed his own methodology to develop the operative list of grants to terminate. Specifically, he used ChatGPT, submitting each grant description and applying a simple prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation." [Dkt.248-11; Dkt.291_at_21]. He gave ChatGPT no

definition of DEI and did not know how it understood the term. [Dkt.248-1_at_53; Dkt.291_at_21–22]. He did not ask ChatGPT whether a grant advanced NEH's statutory mission or purposes, whether it reflected scholarly merit, or whether the grantee had complied with the grant terms. [Dkt.291_at_22]. Asked whether he did anything to prevent ChatGPT from selecting a grant for termination solely because it involved subjects of a particular race or sex, he answered no. [Dkt.248-1_at_53].

Based on Fox's prompt, ChatGPT tagged scores of grants as DEI solely because they involved persons of a particular race, ethnicity, national origin, gender, or sexuality. For example, ChatGPT labeled a documentary on the Colfax Massacre, described in the grant as "the single greatest incidence of anti-Black violence during Reconstruction," as DEI because it "explores a historical event that significantly impacted Black civil rights." [Dkt.248-11_at_2; Dkt.291_at_112]. It gave the same label to a biography of Oscar Adams Jr., because he was "a Black lawyer and jurist," and to a compilation of an author's works in Yiddish because she was a "woman writer." [Dkt.248-11_at_155, 70; Dkt.291_at_112–13].

Fox then copied ChatGPT's classifications and rationales verbatim into the spreadsheet he used to compile grants for termination. [Dkt.291_at_24–25, 123, 98]. Combining the grants that ChatGPT identified as DEI with certain of the awards that NEH staff had rated "high," "medium," or "low" for DEI viewpoints, Fox produced a list of 1,057 "DEI" grants, which included about 440 grants that NEH staff had

labeled "N/A" for DEI. [Dkt.248-17_at_2; Dkt.248-12]. Fox told McDonald and Wolfson: "We reviewed all active grants for DEI involvement and marked them accordingly." [Dkt.248-30_at_2]. Almost all of the 1,057 grants on this list were ultimately terminated for involving DEI. [Dkt.291_at_97–98].

At his deposition, Fox defended the classifications DOGE used to identify grants for termination, including via ChatGPT. The Colfax Massacre grant was DEI, he testified, because "[i]t focuses on … a specific race, here being Black." [Dkt.291_at_114; Dkt.248-1_at_56]. A documentary about Jewish women forced into slave labor during the Holocaust belonged on the list because it was "specifically focused on Jewish cultures" and "the voices of the females in that culture." [Dkt.248-1_at_49; Dkt.291_at_94, 113–14]. Any grant "[i]nherently focused on any ethnicity, culture, gender" qualified. [Dkt.248-1_at_49].

NEH leadership, meanwhile, had no idea how Fox had developed the list of DEI awards to terminate. NEH's then-Acting Chair Michael McDonald testified at his deposition that he had no idea ChatGPT had been used and, upon learning this fact, that Fox's methodology was not an appropriate way to identify grants for termination. [Dkt.248-3_at_10] ("Q. Do you know who drafted these DEI rationales? A. No, I do not. Q. Do you know anything about the criteria that were used for drafting these DEI rationales? A. No."); *see also* [Dkt.248-3_at_11–13]. Shown ChatGPT's "DEI Rationales" that DOGE adopted for specific awards,

McDonald disagreed with them one after another, testifying that the relevant grants should not have been terminated on DEI grounds. [Dkt.248-3_at_11–14; Dkt.291_at_25, 27–28].

DOGE then added roughly 400 more grants—labeled in DOGE spreadsheets as "Biden Grants," *see* [Dkt.248-28]—to the termination list. [Dkt.291_at_106-07]. Neither NEH staff nor ChatGPT had flagged these grants as DEI. *See* [Dkt.248-32; Dkt.248-3_at_26; Dkt.291_at_78]. Instead, Cavanaugh explained, Biden-era grants were presumptively "wasteful." [Dkt.248-2_at_15; Dkt.291_at_107]. Indeed, DOGE had segregated Biden-era grants from the start. On the day of their first meeting, Cavanaugh sent McDonald a spreadsheet containing only the "grants that were awarded during President Biden's administration," noting that the associated funding "can presumably be clawed back." [Dkt.291_at_20–21; Dkt.248-27, Dkt.248-28]. McDonald understood that "open grants that were made under the Biden administration needed to be reviewed," [Dkt.248-3_at_40], an idea he testified came "from Nate and Justin," [Dkt.248-3_at_17]; *see* [Dkt.248-3_at_27] ("We were looking at the last four years of open grants from the Biden administration.").

From March 31 to April 2, 2025, Fox and Cavanaugh muscled through the terminations, over McDonald's explicit objections. Fox and Cavanaugh testified that they needed to act "quickly" to terminate NEH grants because "[t]he general pacing

of DOGE was to try and make decisions and act quickly to avoid Government employees dragging their feet on cancellations." [Dkt.248-2_at_14]. On March 31, Fox sent McDonald a series of urgent emails about Fox planning to move forward right away. [Dkt.248-16]. After Fox and McDonald spoke later that day, McDonald memorialized that Fox had made clear that DOGE, not NEH, would be carrying out the terminations. [Dkt.248-17] ("We understand that you will cancel this list of projects as well."); [Dkt.291_at_97]; *contra* Gov't Br. 8, 43. McDonald noted that he was acting "[a]s you [i.e., DOGE] instructed." [Dkt.248-17].

The next morning, April 1, McDonald urged Fox to spare the grants DOGE had relabeled as DEI. "[W]herever the 'DEI Rationale' on the spreadsheet makes clear that there is no DEI component to the project, there is no justification for canceling the project's funding and you should allow it to continue." [Dkt.248-5_at_3]. He then conceded: "Either way, as you've made clear, *it's your decision* on whether to discontinue funding any of the projects on this list." [Dkt.248-5_at_3] (emphasis added). McDonald therefore was left only to offer his "recommendation" that the grants not be terminated. [Dkt.248-5_at_3]. But, Cavanaugh testified, "Justin [Fox] and I both rejected that recommendation." [Dkt.276-1_at_39; Dkt.291_at_28]; *see also* [Dkt.248-3_at_24] (agreeing that DOGE did not "take [his] recommendation").

Fox prepared and sent to McDonald the final list of grants for termination. [Dkt.291_at_79–80]. Fox and Cavanaugh allowed McDonald to recommend grants to take off the termination list, but with strict limitations, including that "if a grant related to DEI, it couldn't be on the 'keep' list." [Dkt.248-2_at_20]. In addition, McDonald's remit was limited to recommending grants to keep relating to the American Revolution, *see* [Dkt.248-3_at_29], or those for which termination "would not reflect well" on the Administration, [Dkt.248-5_at_3].

McDonald ultimately emailed Fox that he had no "questions or concerns" with Fox going forward with the final list of terminations, [Dkt.276-6_at_2], but this came only after DOGE had rejected McDonald's recommendation to spare the "N/A" grants and decided to cancel them anyway. *See* [Dkt.248-5; Dkt.276-1_at_39; Dkt.291_at_28]; *contra* Gov't Br. 9. At his deposition, McDonald could "not recall approving the termination of [] grant[s] on the list." [Dkt.248-3_at_28]. He could not say whether a given grant was cut as "DEI" or as "wasteful spend." [Dkt.248-3_at_19]. And he had "no idea" why certain grants were put on the "to keep" list. [Dkt.248-3_at_33]; *see also* [Dkt.248-3_at_31].

After Fox and Cavanaugh decided on the final list of grants to terminate, Fox executed the terminations. He drafted the termination notices to grantees in consultation with DOGE's general counsel's office. [Dkt.248-1_at_73]. Fox, not McDonald, typed "/s/ Michael McDonald" onto the signature line of the notices.

[Dkt.248-33_at_41]. Asked who had typed it, McDonald could say only: "[p]resumably the people at DOGE." [Dkt.248-3_at_35; Dkt.291_at_30–31].

Fox obtained administrative access to a Microsoft email account and bypassed NEH's Office of Grants Management to send the notices himself, which he sent from "grants_notifications@nehemail.onmicrosoft.com" rather than from an NEH address. [Dkt.248-1_at_71, 81; Dkt.248-3_at_18, 34; Dkt.291_at_29–30]. Every notice used the same boilerplate, and none told a grantee why their grant had been terminated. [Dkt.291_at_29–30]. In more than twenty years at NEH, McDonald could not recall an outside official executing an agency function in this way. [Dkt.248-3_at_30].

In the aftermath, McDonald and other NEH officials confirmed that DOGE had controlled the terminations. Its then-Director of Research Programs wrote that fellowships had been "terminated by DOGE" and that "this was not an agency decision." [Dkt.248-19; Dkt.291_at_29, 82]. McDonald told NEH staff that the terminations happened "because that's the way DOGE ... [had] operated at other agencies and they applied the same ... methodology here." [Dkt.248-3_at_38]. He could not say how many grants had been terminated. Any figure, he said, would be "conjecture." [Dkt.248-3_at_37]. After the terminations, Wolfson texted McDonald that "DOGE cut grants having nothing to do with DEI." [Dkt.248-34]. McDonald replied with a thumbs-up. [Dkt.248-3_at_39]. And NEH's then-Chief Information

Officer told one grantee: "DOGE did indeed cancel your award. NEH staff, like myself, didn't realize it was happening." [Dkt.248-18].

## III. Prior Proceedings

The *ACLS* Plaintiffs and *Authors Guild* Plaintiffs each filed suit in May 2025, and the district court consolidated the cases. [Dkt.Sheet_Dkt.52]. Plaintiffs moved for a preliminary injunction, which the district court granted in part and denied in part. [Dkt.116]. The court held that Plaintiffs were likely to succeed on their First Amendment claim because Defendants had engaged in unconstitutional viewpoint discrimination. [Dkt.116_at_53–67]. But the court held that Plaintiffs had not established at that time—without the benefit of discovery—that DOGE terminated the grants at issue without authority. [Dkt.116_at_67–70]. The court stayed the effectiveness of the terminations and ordered Defendants not to re-obligate grant funds. [Dkt.122_at_2].

After discovery, Plaintiffs amended their complaint to add a claim under the Equal Protection Clause. [Dkt.230, Dkt.240]. Plaintiffs moved for summary judgment on their *ultra vires*, First Amendment, and Equal Protection claims. [Dkt.291_at_36]. The *Authors Guild* Plaintiffs also moved to certify a class of NEH grantees whose grants were terminated as part of the mass termination, with subclasses for those whose grants were terminated for their perceived "DEI" viewpoints and those whose grants were terminated for their association with the

Biden Administration. [Dkt.291_at_131]. The class excluded grantees who are members of the *ACLS* Plaintiffs.

The district court granted Plaintiffs' motion for summary judgment and the *Authors Guild* Plaintiffs' motion for class certification. On the *ultra vires* claim, the court held that the discovery record conclusively showed that DOGE exercised exclusive control over the termination decisions, without any legal authority to do so. [Dkt.291_at_80–83]. The court ruled that McDonald's later testimony that he "was the final decider" could not create a genuine dispute in the face of the documentary record, [Dkt.291_at_82], which showed that DOGE "exercised decisive control over which grants would be terminated." [Dkt.291_at_31].

The court also held that the mass termination violated the First Amendment because the terminations were explicitly viewpoint-based—"driven by an expressly ideological method of classification"—or based on the grantees' perceived association with the Biden Administration, "a political opponent." [Dkt.291_at_90, 107].

On the Equal Protection claim, the court held that Defendants "employed explicit classifications based on race, ethnicity, national origin, religion, sex, and sexual orientation," triggering heightened scrutiny. [Dkt.291_at_110]. The court held that Defendants could not satisfy strict scrutiny or even rational-basis review. [Dkt.291_at_116].

Finally, the district court granted the *Authors Guild* Plaintiffs' motion for class certification, finding all elements of Rule 23 satisfied. [Dkt.291_at_130–39]. The court entered judgment for Plaintiffs, declared the terminations unlawful, and permanently enjoined Defendants from terminating the grants on the same or substantially similar bases. [Dkt.292_at_1–2]. Defendants appealed.[2]

## SUMMARY OF ARGUMENT

The district court correctly held that the mass termination of Plaintiffs' NEH grants was unlawful for three different reasons.

First, Justin Fox and Nate Cavanaugh from DOGE terminated the grants without any legal authority. Defendants concede a complete "absence of any statutory authority" for DOGE to terminate NEH grants, *Dalton v. Specter*, 511 U.S. 462, 473 (1994), and Fox and Cavanaugh were not exercising any inherent Article II authority of the President. Thus, if DOGE rather than NEH carried out the terminations, they acted without any constitutionally conferred authority.

The record leaves no genuine dispute that DOGE—not NEH's Acting Chair Michael McDonald—exercised sole control over the terminations. At his deposition, McDonald admitted that DOGE selected the grants to terminate. When McDonald

[2] ACLS Plaintiffs do not raise any distinct issues here on their cross-appeal, given that, as Defendants note, ACLS Plaintiffs' earlier appeal remains pending on the district court's July 25, 2025 denial of a preliminary injunction and dismissal of ACLS Plaintiffs' "Institutional Claims."

learned at his deposition that Fox used ChatGPT to identify purported "DEI" grants to terminate, McDonald testified that he did not believe this was an appropriate methodology and that specific terminated grants held by Plaintiffs should not have been terminated on this basis. McDonald also admitted in contemporaneous emails that DOGE had final decisionmaking authority over the terminations. The same day the terminations started, McDonald pleaded to Fox and Cavanaugh that they "should allow" hundreds of grants to continue because there was "no justification for canceling the project's funding." [Dkt.248-5]. But, McDonald continued, "as you've made clear, it's your decision on whether to discontinue funding any of the projects on this list." [Dkt.248-5]. Sure enough, DOGE canceled the grants McDonald asked them not to. Defendants' assertions on appeal that Fox and Cavanaugh were merely "advisors" providing "policy direction" are divorced from the undisputed record below.

Defendants argue that Plaintiffs cannot meet certain prerequisites to bringing an *ultra vires* claim, but courts have made clear that those requirements apply only to statutory *ultra vires* claims that the executive exceeded its statutory authority, not constitutional *ultra vires* claims based on a complete absence of authority. Regardless, Plaintiffs meet those requirements if they do apply.

Second, the grant terminations violated the First Amendment. When the government creates a grant program to subsidize private speech, it may not

discriminate among qualified grantees based on their viewpoints or their political associations. Yet that is precisely what Defendants concede they did—they terminated grants because they perceived the projects as promoting disfavored "DEI" viewpoints. As the Ninth Circuit recognized in enjoining many of the same terminations, the government may not "discriminate between speakers within [a grant] program to suppress viewpoints with which it disagrees." *Thakur II*, 176 F.4th at 1200.

Defendants insist that the government may define the scope of its funding programs, but that principle has no application here. Each terminated grant had already been selected as meritorious, found compliant with all program objectives, and deemed worthy of the financial support and imprimatur of a federal grant. Defendants did not terminate the grants because they fell outside the program's scope or failed to satisfy its criteria. They terminated them because they disliked the ideas the projects expressed. That is not program definition; it is viewpoint discrimination—"an egregious form of content regulation" from which "governments in this country must nearly always abstain." *Chiles v. Salazar*, 607 U.S. 627, 641 (2026).

Defendants likewise violated the First Amendment when they terminated hundreds of non-"DEI" grants solely because they were associated with a disfavored political administration. Just as the government may not deny grant funding on the

basis of viewpoint, it may not "deny a benefit to a person because of his constitutionally protected … associations." *Branti v. Finkel*, 445 U.S. 507, 515 (1980). Defendants did exactly that, labeling grants as "Biden Grants" and deeming them presumptively wasteful based solely on that association.

Third, many of the grant terminations violated the equal protection guarantee of the Fifth Amendment. With shocking candor, Defendants admitted that they terminated scores of grants explicitly because they concerned persons of a certain race, ethnicity, national origin, religion, sex, or sexual orientation. DOGE's official rationale for terminating Plaintiffs' grants included that they concerned a "Black lawyer," "Black children" who were enslaved, a "woman writer," "Jewish" suffering, "females," and the "Asian American experience." Below, Defendants did not deny that they made express classifications based on race and other protected characteristics to identify grants for termination.

The Supreme Court has repeatedly affirmed that strict scrutiny applies to *any* racial classifications by government officials, no matter the government's intent. Strict or heightened scrutiny applies to the other classifications as well. Defendants ask the Court to create an exception to this rule because they did not make classifications based on the grantees' protected traits, but rather those of the subjects of the grantees' work. On Defendants' view, public libraries could refuse to carry books about Black or Jewish people, so long as the classification is not based on the

race or religion of the books' authors. The Supreme Court has repeatedly rejected such a proposition.

In any event, the district court correctly held in the alternative that Defendants' termination of grants also fails rational-basis review. While Defendants assert interests in "prioritizing merit," "reducing wasteful spending," and carrying out the President's Executive Order on DEI, terminating a grant solely because it is about a person of a certain race, religion, sex, or sexual orientation is not rationally related to advancing these interests.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 357 (2d Cir. 2025). The Court reviews the grant of class certification for abuse of discretion. *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022).

## ARGUMENT

### I. DOGE Terminated NEH Grants Without Legal Authority.

The district court correctly held that DOGE terminated Plaintiffs' grants without legal authority, rendering the terminations *ultra vires* government action.

First, DOGE operatives Fox and Cavanaugh—not McDonald or anyone else at NEH—carried out the terminations. Defendants' portrayal of Fox and Cavanaugh as mere advisors making recommendations is belied by the undisputed factual record. Second, DOGE had neither statutory nor constitutional authority to terminate

NEH grants. Indeed, Defendants concede the absence of any statutory authority for DOGE to terminate NEH grants, and Fox and Cavanaugh were not carrying out any presidential direction issued pursuant to the President's inherent constitutional authority. Third, Defendants argue that Plaintiffs do not satisfy the prerequisites for certain *ultra vires* claims, but those standards apply only to "statutory *ultra vires* claims" alleging that an agency exceeded its statutory authority, not constitutional *ultra vires* claims, like Plaintiffs' claim here, that the executive acted in the complete absence of statutory authority. Fourth, in any event, Plaintiffs satisfy the standards that Defendants cite, because Plaintiffs have no alternative means of review of their ultra vires allegations and DOGE's conduct violates a specific prohibition.

**A.** Defendants' principal defense on the *ultra vires* claim is to insist—against all record evidence—that McDonald and not DOGE "did" the terminating. Gov't Br. 18. On Defendants' telling, Fox and Cavanaugh were merely "White House officials" providing "policy direction" to NEH, and they "never claimed or exercised any authority to terminate any grants." Gov't Br. 19, 23. But the actual record shows that Fox and Cavanaugh, as agents of DOGE: (1) selected which NEH grants to terminate, (2) made the final decision to terminate those grants, and (3) executed the terminations. As McDonald himself put it, he could make only "recommendation[s]," because it was DOGE's "decision on whether to discontinue funding any of the projects." [Dkt.248-5_at_3].

1. Fox and Cavanaugh took exclusive control of the termination selection process as soon as they were sent to NEH by DOGE leadership. Fox used ChatGPT to identify grants to terminate for purportedly involving "DEI." [Dkt.291_at_78]. Nobody at NEH knew that Fox had used ChatGPT to select grants for termination, and they certainly did not know that the "DEI rationales" for each grant in the operative termination spreadsheets were copied verbatim from ChatGPT's output. [Dkt.248-3_at_10]. McDonald learned of Fox's use of ChatGPT for the first time at his deposition. [Dkt.248-3_at_10, 13, 14]. He testified that he did not believe it was an appropriate methodology for selecting grants to terminate, and that if specific grants were terminated based on the ChatGPT rationales he was shown (which they were), that was not "an appropriate basis for termination." [Dkt.248-3_at_11, 12]; *see also* [Dkt.248-3_at_13, 14].

It was also Fox and Cavanaugh who decided which grants that NEH staff had identified as high, medium, or low risk of DEI involvement to include on the termination list, together with the grants ChatGPT had labeled DEI (for a total of 1,057 purported DEI grants to terminate). [Dkt.248-12]. And it was Fox and Cavanaugh's decision to add hundreds of non-DEI, Biden-era grants to the list for termination. *See* [Dkt.248-3_at_36]. Neither NEH staff nor ChatGPT had flagged any of these grants as DEI or suggested that they be terminated. [Dkt.248-3_at_36; Dkt.291_at_78]. Instead, Cavanaugh determined that Biden-era grants were

presumptively "wasteful" and should be added to the termination list. [Dkt.248-2_at_15; Dkt.291_at_107].

2. Fox and Cavanaugh then made the final decision to terminate the grants they had selected. McDonald tried to resist some of the terminations, in particular for the awards that NEH staff listed as "N/A" for implicating DEI. On April 1, 2025, the same day that Fox began sending termination letters, McDonald emailed Fox and Cavanaugh that "[w]e [*i.e.*, NEH] think these projects are harmless when it comes to promoting DEI." [Dkt.248-5_at_3]. He wrote:

> [O]ur *recommendation* is that wherever the "DEI Rationale" on the spreadsheet makes clear that there is no DEI component to the project, *there is no justification for canceling the project's funding*[,] and *you should allow it to continue*.

[Dkt.248-5_at_3] (emphases added). But, he added, "as you've made clear, it's *your decision on whether to discontinue funding any of the projects on this list*." [Dkt.248-5_at_3] (emphasis added). Accordingly, in McDonald's own words, it was DOGE's "decision"—not his—whether to terminate any of the grants, and he was left only to "recommend[]" which grants should be spared. [Dkt.248-5_at_3].

DOGE then rejected McDonald's "recommendation[s]" and terminated the grants over McDonald's objection. [Dkt.276-1_at_39] ("Justin and I both rejected that recommendation.").

It was Fox who sent McDonald the final list of grants "to cancel" and grants "to keep." [Dkt.248-5_at_2; Dkt.248-3]. McDonald confirmed that Fox "prepared

the list" and was the person who "put ... grant[s] on th[e] list for termination." [Dkt.248-3_at_27, 28]. McDonald did "not recall approving the termination of [] specific grant[s]" on the list. [Dkt.248-3_at_28]. At his deposition, McDonald did not know whether a grant was included on this list because it supposedly implicated DEI or because it constituted "wasteful spend." [Dkt.248-3_at_19]. He also had "no idea" why particular grants were placed on the "to keep" list. [Dkt.248-3_at_33]; *see also* [Dkt.248-3_at_31]. All of these determinations were made solely by DOGE. [Dkt.248-3_at_19].

3. Fox and Cavanaugh exclusively executed the terminations. It was Fox who drafted the termination notices, in consultation with DOGE's general counsel's office. [Dkt.248-1_at_73]. It was Fox who typed McDonald's signature on the letters as "/s/Michael McDonald." [Dkt.248-1_at_8; Dkt.248-3_at_35] ("Q: Did you type in /s/ Michael McDonald? A: No. Q: Okay. Who typed that in? A: Presumably the people at DOGE."); [Dkt.248-16]. And it was Fox who emailed the termination notices to grant recipients, using a non-government email address. [Dkt.248-1_at_82].

In the days immediately after the terminations, McDonald, his deputy Wolfson, and senior NEH staff all unequivocally stated that DOGE had terminated the awards. *See supra* pp.13-14. In the words of one official, "this was not an agency decision." [Dkt.291_at_29].

The district court correctly held that this record "admits of only one conclusion": "DOGE was calling the shots." [Dkt.291_at_80–81]. "DOGE controlled the lists, DOGE rejected McDonald's suggestions, DOGE added additional grants for termination, DOGE drafted and sent the notices, and DOGE dictated which previously awarded grants would live or die." [Dkt.291_at_80–81]. The one time McDonald attempted to intervene—when he recommended not to terminate a large number of the grants—Fox and Cavanaugh rejected him. The district court correctly held that there was no genuine dispute that DOGE, and not anyone at NEH, terminated the grants.

In light of the record evidence, Defendants' assertion that Fox and Cavanaugh were merely "advisors" providing "policy direction" or "guidance" to NEH beggars belief. Gov't Br. 23–24, 26. As the district court noted, McDonald's admission that it was DOGE's "decision" whether to terminate any of the grants was "incompatible with any claim that DOGE was merely acting in an advisory capacity." [Dkt.291_at_80; *see* Dkt.291_at_31]. It was, instead, "the language of an agency head acknowledging that the authority Congress vested exclusively in him had, in practical effect, been taken out of his hands." [Dkt.291_at_80].

Defendants' scattershot attempts to show otherwise go nowhere. They note that "Plaintiffs received letters bearing the signature" of McDonald, Gov't Br. 22, but "Fox and Cavanaugh ... used his signature to execute decisions they had already

made," [Dkt.291_at_82]. They did not even bother to use his official agency signature, instead typing in "/s/Michael McDonald." [Dkt.248-3_at_35]. Defendants point to the April 1 email chain where Fox wrote to McDonald that Fox was executing the termination "with your permission," Gov't Br. 22, but that is the same chain where McDonald "recommend[ed]" in vain that Fox not proceed with the terminations, before acknowledging that it was DOGE's "decision on whether to discontinue funding any of the projects on this list." [Dkt.248-5_at_3]. "The evidence shows that McDonald was powerless" to overrule DOGE. [Dkt.291_at_82].

This case is nothing like Defendants' "hypothetical" where the President or one of his advisors "calls a Cabinet Secretary and asks the Secretary to take a particular list of actions, and the Secretary then takes the actions." Gov't Br. 24. Defendants' hypothetical assumes what it is trying to prove—that the Secretary "t[ook]" the relevant actions at issue. The undisputed evidence overwhelmingly shows otherwise.

**B.** Defendants' remaining arguments are that, even if DOGE did terminate the grants without statutory authority, Plaintiffs cannot meet the prerequisites for an ultra vires cause of action set forth in *Nuclear Regulatory Commission v. Texas* ("*NRC*"), 605 U.S. 665, 680 (2025). Specifically, Defendants argue that Plaintiffs have alternative means of relief and cannot point to a "specific prohibition" in statute on

DOGE terminating the awards. Gov't Br. 21. However, these requirements do not apply to an *ultra vires* claim like the one Plaintiffs pursue here.

There are "two distinct forms of ultra vires actions": "constitutional and statutory." *Newsom v. Trump*, – F.4th – , 2026 WL 3180273, at *17 (9th Cir. Oct. 23, 2026) (ruling for plaintiffs on constitutional *ultra vires* claims). "The scope and stringency of *ultra vires* review depends on whether plaintiffs' claim is statutory or constitutional in nature." *AFL-CIO v. Dep't of Lab.*, 836 F. Supp. 3d 137, 172 (D.D.C. 2026); *accord Sustainability Inst. v. Trump*, 165 F.4th 817, 829 (4th Cir. 2026).[3] *NRC*'s "stringent requirements" for asserting *ultra vires* claims apply only to statutory ultra vires claims. *AFL-CIO*, 836 F. Supp. 3d at 173. "Constitutional ultra vires claims need not satisfy these rigorous requirements." *Id.*; *accord Sustainability Inst.*, 165 F.4th at 830 ("Nonstatutory review claims alleging a constitutional violation ... are not subject to the same restrictions."); *Newsom*, 2026 WL 3180273, at *17 (similar).

The key distinction between the two types of claims is that "*[u]ltra vires* claims that allege executive action in excess of statutory authority are statutory in

[3] Defendants contend the district court erred in relying on *AFL-CIO* for this proposition because the court in that case later granted summary judgment to the government. Gov't Br. 25. But that was only because the plaintiff "concede[d] that the statutory *ultra vires* requirements appl[ied]" and "fail[ed] to invoke the Constitution at any point in their *ultra vires* briefing." 836 F. Supp. 3d at 173.

nature, while ultra vires claims that allege executive action in the 'absence' of statutory authority are constitutional." *AFL-CIO*, 836 F. Supp. 3d at 173 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). Because constitutional ultra vires claims are limited to the rare instances where there is a complete and conceded absence of statutory authority, they do not present the concerns animating *NRC's* stringent requirements—that "ultra vires review could become an easy end-run around the limitations" on reviewing alleged statutory violations, if parties could "dress up a typical statutory-authority argument as an ultra vires claim." *NRC*, 605 U.S. at 681-82.

Constitutional ultra vires claims rest on bedrock separation-of-powers principles. The Constitution assigns Congress the power to create federal departments and assign them responsibilities. U.S. Const. art. I, § 8, cl. 18 (Congress shall make necessary and proper laws for carrying out the powers vested in "any Department or Officer" of the government). "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986). And, absent congressional authorization, one agency cannot perform responsibilities that Congress assigned to a different agency. *See Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008). The agency assigned statutory responsibility over an action may not "abdicate[] its final reviewing authority" to another executive branch entity. *Id.* (quotations omitted).

An entity within the Executive Branch is therefore constitutionally powerless to wield official power on a topic in the complete absence of statutory authority—unless it is acting pursuant to Presidential direction, on a matter for which the President has inherent constitutional authority to act. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (the "President's power" to act "must stem either from an act of Congress or from the Constitution itself"). Thus, when the government concedes the "absence of any statutory authority" for an executive branch action, the lawfulness of that action "necessarily turn[s] on whether the Constitution authorized [that] action[]," *Dalton*, 511 U.S. at 473. If neither the Constitution nor a statute authorizes the action, it is constitutionally *ultra vires*. *See AFL-CIO*, 836 F. Supp. 3d at 173 (citing *Youngstown*, 343 U.S. 579).

This case presents a claim of such constitutionally *ultra vires* action. Plaintiffs do not allege that DOGE exceeded some statutory grant of authority over NEH grants. They allege that DOGE terminated grants in the complete "absence of statutory authority." *AFL-CIO*, 836 F. Supp. 3d at 173-74. And the absence of statutory authority is "conceded," *Dalton*, 511 U.S. at 473, as Defendants do not identify any statute that gave DOGE officials statutory authority to carry out the terminations. Indeed, Congress has not empowered DOGE, including the "DOGE Team" at GSA that included Fox and Cavanaugh, to do anything. Accordingly, if DOGE carried out the terminations, the terminations would be lawful only if DOGE

was acting at the direction of the President pursuant to some inherent constitutional authority.[4]

DOGE was not exercising any constitutional authority in terminating NEH grants. Like in *Youngstown*, Defendants rely on Article II and "the President's inherent constitutional power" to justify DOGE's actions. *Dalton*, 511 U.S. at 473. They characterize DOGE as "White House officials," imply that Fox and Cavanaugh were acting as agents of the President, and argue that "no degree of White House influence over which grants to terminate would state an ultra vires claim." *See* Gov't Br. 19, 23–26. That contention fails. For one, Fox and Cavanaugh were not even "White House officials"—they were on GSA's payroll. More importantly, regardless of whether DOGE had authority to "influence" the NEH Chair's decisions, there is no evidence that the President delegated authority to them or DOGE generally to do what they actually did: exercise controlling authority over the NEH Chair in exercising his duties over NEH grants. To the contrary, the President directed that

[4] Defendants are wrong (at 26–27) that *Dalton* precludes casting this claim as constitutional in nature. *Dalton* itself distinguished cases with a "conceded absence of any statutory authority," like *Youngstown*, from the situation in *Dalton* where the plaintiffs alleged that the President acted only "in excess of ... statutory authority." *Dalton*, 511 U.S. at 473; *see also Am. Hist. Ass'n v. Trump*, 835 F. Supp. 3d 1, 18 (D.D.C. 2026) (distinguishing *Dalton* on this basis, in holding that "plaintiffs likely have an equitable constitutional cause of action under *Youngstown*").

*agency heads* decide which grants to terminate, with DOGE limited to a consultative role. Exec. Order No. 14222 § 3(b), 90 Fed. Reg. 11095 (Mar. 3, 2025).[5]

DOGE lacked any statutory or constitutional authority to terminate Plaintiffs' awards, and that suffices to establish Plaintiffs' ultra vires claim.

**C.** Even if *NRC's* requirements for statutory *ultra vires* claims did apply, they present no barrier here.

First, neither the Tucker Act nor the APA provides a "meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 680. The Court of Federal Claims has jurisdiction under the Tucker Act only for claims invoking "a money-mandating source [of law]," which is one that entitles the particular plaintiff to a particular sum of money. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). The constitutional provisions underlying the separation of powers are not money-mandating, *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and Plaintiffs do not allege any breach of contract that would give rise to a "money-mandating source," *Turping v. United States*, 134 Fed. Cl. 293, 306 (2017). Indeed, because Plaintiffs' *ultra vires* claim rests on the *complete absence* of legal authority,

[5] This Court therefore need not decide the constitutional question that would arise if the President ordered DOGE to exercise authority reserved by statute for the NEH Chair. This Court has held, though, that the President "cannot take away [an] agency's statutory authority or exercise it himself." *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016).

the claim by definition does not rest on any affirmative money-mandating source of law. The Court of Federal Claims cannot provide an adequate alternative where it would lack jurisdiction.

Moreover, the Court of Federal Claims "may not provide equitable relief," *Larkin v. United States*, 177 Fed. Cl. 17, 22 (2025), which is the sole relief Plaintiffs sought on their *ultra vires* claim (and all their other claims). The Court of Federal Claims thus "does not provide an adequate alternative forum in which Plaintiffs can obtain the equitable relief they seek." [Dkt.291_at_62].

Nor does the APA provide a meaningful and adequate alternative vehicle. In dozens of cases over the last two years—and in their own appellate brief here—Defendants have made clear their view that federal grantees may not challenge the termination of awards under the APA, because the Tucker Act displaces the APA's waiver of sovereign immunity. *See* Gov't Br. 1 ("[D]istrict courts cannot enjoin such terminations under the [APA] because [of] the Tucker Act."); *see also id.* at 15, 20–21, 32 n.2. The Supreme Court has preliminarily endorsed this view, holding in two cases that "the APA's limited waiver of sovereign immunity" likely foreclosed grant-termination claims under the APA. *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (quoting *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025)). Plaintiffs agreed below that these decisions "appear to foreclose ... jurisdiction over their APA claims." [Dkt. 283_at_11 n.1]. The government cannot

argue that APA review is an "available" alternative when they have tentatively convinced the Supreme Court it is not.[6]

The APA also is not an alternative source of review because DOGE is not an "agency" subject to the APA. The district court catalogued the many instances in which the government has taken the position that DOGE is *not* an agency whose actions are subject to review under the APA. *See* [Dkt.291_at_63–65]. "The Government cannot simultaneously deny that DOGE is subject to APA review and then invoke the supposed availability of APA review as a reason to foreclose equitable review of DOGE's allegedly *ultra vires* conduct." [Dkt.291_at_65]. Indeed, the government does not suggest that APA review is available for the claims that Plaintiffs actually brought against DOGE in this case, arguing instead only that DOGE's decisions may be reviewed to the extent they "flowed through to ... final decisions" by NEH. Gov't Br. 20. But the premise of Plaintiffs' claim is that *DOGE*, not NEH, made the "final decisions" to terminate grants.

Second, *NRC*'s requirement that Plaintiffs establish the violation of a "specific prohibition" in a statute does not apply to *ultra vires* claims based on the absence of any statutory authority at all. *See AFL-CIO*, 836 F. Supp. 3d at 173; *New Mexico v.*

---

[6] Defendants do not argue on appeal that the Tucker Act deprived the district court of jurisdiction over any of Plaintiffs' claims; they limit their invocation of the Tucker Act to arguing that the requirements for an *ultra vires* cause of action are not met.

*Musk*, 824 F. Supp. 3d 80, 105 (D.D.C. 2026); *Newsom*, 2026 WL 3180273, at *14–16. Were it otherwise, *Youngstown* would have come out the other way, because there was no specific prohibition on the President seizing the steel mills. Applying a rigid "specific prohibition" requirement in circumstances where the executive acted in the absence of any governing statute would result in "individual[s] [being] left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

In any event, DOGE's actions can be viewed as violating a specific prohibition for *ultra vires* purposes. The NEH Act vests all authority over grants in one individual: the NEH Chairperson. 20 U.S.C. § 956(c). Fox and Cavanaugh plainly acted contrary to the "specific prohibition" that only the NEH Chairperson may exercise authority over NEH grants. *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 27 (2d Cir. 2022). If Defendants' contrary argument were correct, any rogue actor in the government could exercise authority that Congress delegated to a specific official or agency, and there would be no *ultra vires* review unless the statute also specifically prohibited other individuals from exercising the delegated authority. That is not the law.

## II. The Grant Terminations Violated the First Amendment.

### A. The "DEI" Terminations Violated the First Amendment.

#### 1. The First Amendment Prohibits Denying or Rescinding Grants Based on Viewpoint.

Viewpoint discrimination is the cardinal First Amendment sin. "[I]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The government thus "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Free speech "depend[s] on the outcome of no elections." *Barnette*, 319 U.S. at 638.

Defendants do not challenge the district court's conclusion that Plaintiffs' speech relating to their NEH-funded projects was private speech, not government speech. [Dkt.291_at_86–89] ("The history of the expression at issue confirms that ... Congress designed NEH to support independent, private expression rather than to convey a governmental message.").

When the government subsidizes private speech, it may not discriminate on the basis of the recipient's viewpoint. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). Even when "a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for

any number of reasons, there are some reasons upon which the government may not rely." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Id.*

In *Finley*, the Supreme Court rejected a facial challenge to Congress's direction that the National Endowment for the Arts consider "general standards of decency and respect" in awarding grants. 524 U.S. at 580. But the Court made clear it "would confront a different case" in an as-applied challenge if an agency denied a grant to a qualified applicant because of "invidious viewpoint discrimination." *Id.* at 587. "Even in the provision of subsidies," the Court explained, "the Government may not 'aim at the suppression'" of "disfavored viewpoints." *Id.*

Numerous Supreme Court cases reinforce *Finley*'s direction that the government may not make public funding contingent on compliance with speech restrictions. Congress cannot condition funding to legal aid organizations on their agreement not to make disfavored legal arguments, even though Congress is not required to make the funding available in the first place. *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 547-48 (2001). A state may not deny employment to a public school teacher because he expresses viewpoints the state disfavors, even though the teacher has no entitlement to state employment. *Perry*, 408 U.S. at 597 (government "may not deny a benefit to a person on a basis that infringes his

constitutionally protected interests"). And a state university may not deny a subsidy to a student newspaper because of its religious content, even though state universities need not provide such subsidies in the first place. *Rosenberger*, 515 U.S. at 837.[7]

This Court's cases similarly hold that "[a] funding decision based on the speaker's viewpoint is impermissible." *Amidon v. Student Ass'n*, 508 F.3d 94, 101 (2d Cir. 2007). A state university may not deny or reduce competitive subsidies for student groups based on "the value or popularity of [the group's] speech." *Id.* Likewise, a state cannot reject a food truck's application to participate in a public event "solely because the [] truck and its products were branded with ethnic slurs." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 33 (2d Cir. 2018). Although the state could have denied the plaintiff's application for any of several reasons, *id.* at 28-29, "the First Amendment prohibits [the state] from denying applicants a permit solely because" of their viewpoints, *id.* at 40 n.8.

---

[7] Defendants are wrong in suggesting that *Rosenberger* is inapposite because it's a limited-public-forum case. *See* Gov't Br. 33. "The denial of funding in a viewpoint-discriminatory manner is as impermissible as the denial of access to a physical forum in a viewpoint-discriminatory manner." *Amidon v. Student Ass'n*, 508 F.3d 94, 100 (2d Cir. 2007).

Defendants are also wrong that *Finley* disavowed *Rosenberger*'s application to the subsidy context. *See* Gov't Br. 33. *Finley* explained that *Rosenberger* does not require the government to always open its programs to all comers, but it expressly reaffirmed *Rosenberger*'s holding that when applicants satisfy a program's criteria, the government may not then impose "a penalty on disfavored viewpoints." *Finley*, 524 U.S. at 587.

These principles apply straightforwardly here. The First Amendment did not require the federal government to fund humanities scholarship or make grant funds available under the various NEH programs. And once Congress created those programs, NEH was free to enforce the "program's purposes and limitations" by, *e.g.*, denying grants to works that fall short of program standards. *Velazquez*, 531 U.S. at 543; *Finley*, 524 U.S. at 585. But neither NEH nor any other governmental actors may deny or revoke funding based on a distaste for grantees' private speech—they may not "leverage [their] power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." *Finley*, 524 U.S. at 586-87.

#### 2. Defendants Do Not Dispute That They Terminated "DEI" Grants Based on Viewpoint.

Defendants do not deny that they revoked funding from DEI grantees solely because they believed their projects promoted disfavored viewpoints. *See* Gov't Br. 28 (acknowledging it terminated "grants based on opposition to the viewpoints of the DEI projects"); *see* [Dkt.291_at_98].[8] Nor could they: the DEI Grants had already navigated NEH's award process, surviving multiple rounds of expert peer review, administrative approvals, NEH Council review, and a final determination by the NEH Chair that the award was merited. *See* [Dkt.291_at_6–7, 25, 31].

[8] Defendants also do not dispute the district court's finding that "DEI is, of course, a viewpoint." [Dkt.291_at_89]; *see Thakur II*, 176 F.4th at 1201 ("[T]he government does not dispute that [it] terminated the grants at issue because of the recipients' perceived expression of DEI, DEIA, or environmental justice viewpoints.").

Defendants did not re-evaluate the grantees' merit; instead, "[t]he record establishes that the termination decisions were driven by an expressly ideological method of classification." [Dkt.291_at_90]; *see* [Dkt.291_at_118].

In total, Fox, Cavanaugh, and ChatGPT explicitly identified 1,057 grants as "DEI"—the operative spreadsheet had a column titled "Yes/No DEI?" and an answer for "Yes" for each of these grants. [Dkt.248-12]. The grants were then terminated on that basis. [Dkt.248-25]; [Dkt.248-2_at_20] ("Q. [I]f a grant related to DEI, it couldn't be on the 'keep' list, right? A. That's correct."); [Dkt.248-3_at_16] (agreeing that the result of this process "was specifically to identify grants for potential termination"). Defendants have never claimed these grants were reviewed for their humanistic merit or terminated for any reason other than their viewpoint (or perceived viewpoint, which is the same thing for First Amendment purposes, *see Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016)). To the contrary, "the Government admits that these grants were terminated because they were deemed to promote DEI." [Dkt.291_at_98]. That undisputed viewpoint discrimination violated the First Amendment.

### 3. Defendants' Contrary Arguments Are Meritless.

Defendants claim that their admitted viewpoint discrimination was lawful, insisting that "the First Amendment permit[s] terminating highly competitive NEH grants based on opposition to the viewpoints of the DEI projects." Gov't Br. 28. As

the Ninth Circuit concluded in rejecting the identical position, "we cannot reconcile the position the government advances here—that it is free to terminate funding even when it does so based on viewpoint—with binding Supreme Court authority." *Thakur v. Trump*, 163 F.4th 1198, 1206 (9th Cir. 2025) ("*Thakur I*"). Defendants' arguments should fare no better here.

**1.** Defendants' lead argument—that competitive grant programs are immune from First Amendment constraints, Gov't Br. 28—contradicts the precedents discussed above. "[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." *Finley*, 524 U.S. at 587; *see supra* Part II.A.1; *Velazquez*, 531 U.S. 533 (invalidating restriction within competitive grant program); *Perry*, 408 U.S. at 597 (viewpoint discrimination unconstitutional in competitive public employment); *Amidon*, 508 F.3d at 100 (viewpoint discrimination unconstitutional in competitive funding program); *see also Thakur II*, 176 F.4th at 1203.

**2.** Defendants cite *Rust v. Sullivan*, 500 U.S. 173 (1991), for the proposition that the government can "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program." Gov't Br. 27. But *Rust* does not apply here. *Rust*'s holding turned on the speech being "*government* speech." *See Velazquez*, 531 U.S. at 541 (distinguishing

*Rust* on this basis). Here, in contrast, as Defendants concede, NEH-funded scholarship is private speech. *See* [Dkt.291_at_86–89].

When it comes to private speech, neither *Rust* nor any other case authorizes viewpoint discrimination within a grant program. *Rust*, like *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), on which Defendants also rely, Gov't Br. 28, holds merely that the government may define a subsidy program's scope even though doing so inevitably favors certain types of speech. 500 U.S. at 193 (holding that Congress could fund preventive family-planning counseling without also funding abortion counseling). Here, for instance, Congress permissibly chose to have NEH subsidize humanities works to the exclusion of works in, *e.g.*, the hard sciences. NEH may lawfully enforce those boundaries by rejecting works in the hard sciences or works that otherwise deviate from the "limits and purposes of the program." *Velazquez*, 531 U.S. at 543.

But once the government has defined the scope of its subsidy program, it "must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. It may not then "discriminate between speakers within that program to suppress viewpoints with which it disagrees." *Thakur II*, 176 F.4th at 1200-01 & n.6. Defendants' reliance on *Rust* thus overlooks the "critical distinction between creating or ceasing a particular program (or subsidy, or forum), on one hand, and discriminating against disfavored speaker viewpoints within a program (or subsidy,

or forum), on the other." *Id.* at 1202; *see also Velazquez*, 531 U.S. at 547–48 (distinguishing between restrictions "necessary to define the scope and contours of the federal program" and restrictions that "exclude certain vital theories and ideas" within the program).

In terminating class members' grants, Defendants were not defining the scope of NEH's programs; they were discriminating among projects indisputably within their programs' scope. NEH itself had already determined that each funded project satisfied its program's criteria and NEH's threshold of excellence to warrant a prestigious award. Defendants did not terminate the class members' grants because their projects suddenly became non-compliant, non-meritorious, or otherwise unqualified for their respective programs. Instead, Defendants "identified already-awarded grants as objectionable because they were perceived to relate to DEI; generated 'DEI Rationales' to explain why those projects implicated that disfavored viewpoint; and then clawed back funding on that basis." [Dkt.291_at_104]. Nothing in *Rust* or *Regan* authorizes this viewpoint discrimination.

Defendants cannot shoehorn this case into *Rust*'s framework by "recast[ing] [the] condition on funding as a mere definition of its program, … lest the First Amendment be reduced to a simple semantic exercise." *Velazquez*, 531 U.S. at 547; *see Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013) ("*AOSI*") (cautioning courts that "the definition of a particular program can

always be manipulated to subsume the challenged condition"); *All. for Open Soc'y Int'l, Inc. v. Agency for Int'l Dev.*, 651 F.3d 218, 237-38 (2d Cir. 2011). Defendants do not claim that any statute, regulation, or NEH program definition carves out works expressing "DEI" viewpoints from the government's subsidization of exemplary humanities works. Quite the contrary, Congress directed NEH to prioritize projects that reflect "the diversity and richness of our American cultural heritage, including the culture of a minority, inner city, rural, or tribal community." *See* 20 U.S.C. § 956(c)(4).

**3.** Defendants are also wrong to suggest that the First Amendment prohibits only restrictions on speech occurring outside the government-funded program. *See* Gov't Br. 29–30 (citing *AOSI*, 570 U.S. at 214-15). While that is indeed one limitation the First Amendment places on state actors' funding decisions, "the government offers no support for the assertion that this is the *only* [such] constraint." *Thakur II*, 176 F.4th at 1204. To the contrary, "Supreme Court precedent defeats [that assertion]," *id.*, by making clear that the government violates the First Amendment when it discriminates on viewpoint *within* a program.

In *Rosenberger*, for example, the university violated the First Amendment when it excluded a newspaper from its subsidy program, even though it did not restrict the newspaper's speech outside the program. 515 U.S. at 829-32. In *Velazquez*, the government violated the First Amendment by restricting the

arguments LSC-funded lawyers could make while representing LSC clients *within* the government program. 531 U.S. at 546–49.[9] In *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), Boston violated the First Amendment by excluding an organization from a flag-raising ceremony because it sought to fly a religious flag, even though it did not limit the organization's speech outside the flag-raising ceremony. *Id.* at 258–59. And in *Wandering Dago*, the state violated the First Amendment by excluding a food truck from a government event because of the speech on its menu, even though it imposed no limits on what the menu said outside the event. 879 F.3d at 33. In each case, the relevant limits applied only *within* the program, and in each one the First Amendment prohibited the challenged viewpoint discrimination.[10] *See also Matal v. Tam*, 582 U.S. 218, 253 (2017) (Kennedy, J., concurring in the judgment) ("[O]ur cases are clear that viewpoint discrimination is not permitted where, as here, the Government 'expends funds to encourage a diversity of views from private speakers.'" (quoting *Velazquez*, 531 U.S. at 542)).

---

[9] The statute in *Velazquez* also applied to LSC-funded lawyers' work on behalf of non-LSC clients, *id.* at 538, but that was not the basis for the Court's ruling. *See id.* at 547–48 (finding restriction unlawful because "[i]n no lawsuit *funded by the Government* can the LSC attorney … challenge existing welfare laws" (emphasis added)).

[10] Even *AOSI* made clear that restrictions on speech within a program can violate the First Amendment, including when they are "not relevant to the objectives of the program." 570 U.S. at 214–15.

**4.** Defendants mischaracterize the district court as holding that "the government's compliance with the First Amendment depends on whether the action is taken by Congress or the same action is taken by the Executive." Gov't Br. 31. The district court drew no such line: It recognized the permissible scope of conduct by both branches, noting that Congress may permissibly "define the subjects and activities that federal funds will support, *and an agency acting pursuant to statutory authority may implement those limits*." [Dkt.291_at_98–99] (citing *Rust*, 500 U.S. at 194) (emphasis added). The First Amendment problem was not that DOGE was calling the shots, but that the government discriminated on viewpoint among projects that satisfied all criteria of their respective programs.

The district court looked to NEH's statutory mandate not out of some notion of legislative supremacy, but to discern whether discriminating against DEI was "necessary for the program's purposes and limitations." *Velazquez*, 531 U.S. at 543. It was obviously not; it was instead the "post-award cancellation of grants that had already been approved under NEH's statutory program, based on nonstatutory criteria that Congress did not enact—indeed, that are antithetical to what Congress did enact—and that targeted projects because they were perceived to express a disfavored viewpoint." [Dkt.291_at_99].

### B. The "Biden-Era" Terminations Violated the First Amendment.

Defendants likewise violated the First Amendment when they terminated the Biden-Era Grants. As discussed, even in the context of discretionary benefits, "there are some reasons upon which the government may not rely" in denying the benefit. *Perry*, 408 U.S. at 597. Political association is one of them. *See Buckley v. Valeo*, 424 U.S. 1, 15 (1976); *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). Accordingly, as Defendants concede, *see* Gov't Br. 34, the government cannot "deny a benefit to a person because of his constitutionally protected … associations." *Branti v. Finkel*, 445 U.S. 507, 515 (1980).

The record makes "abundantly clear" that Defendants targeted and terminated the Biden-Era Grants based on grantees' perceived political affiliation with the Biden Administration. [Dkt.291_at_106]. When NEH's Chief Information Officer first directed NEH staff to review grants for termination, he directed them to review only grants issued "from 2021 to the present." [Dkt.248-4_at_2]; *see also* [Dkt.248-8_at_2] (Wolfson describing "historical review of NEH's grants since January 2021"); [Dkt.248-26_at_9]. Likewise, as soon as DOGE entered the picture, Cavanaugh sent McDonald "a list of grants that were awarded during President Biden's administration" and stated that all associated funds "can presumably be clawed back." [Dkt.248-27_at_2]. And while DOGE's initial focus was on the subset of Biden-era grants they believed promoted DEI, Fox and Cavanaugh later deemed

"wasteful" even those Biden-era grants that were not flagged for DEI. As McDonald told NEH staff, "it became clear that [Fox and Cavanaugh] were looking at the totality of the awards that had been with [the] previous administration." [Dkt.248-3_at_36].

Defendants have never claimed—either contemporaneously or in this litigation—that any of these grants were terminated for a lack of humanistic merit or based on a re-evaluation of their contributions to the humanities. Instead, they were expressly labeled "Biden Grants," *see, e.g.*, [Dkt.248-28], and (if they were not terminated for promoting DEI) they were terminated on this basis. As the district court correctly ruled, "[t]hat is not a permissible funding criterion. It is discrimination based on perceived political association." [Dkt.291_at_107].

Defendants argue that their focus on "Biden Grants" was just to help them identify "grants promoting DEI," Gov't Br. 35, but that is belied by the fact that Defendants terminated hundreds of "Biden Grants" that did *not* implicate DEI. [Dkt.291_at_106–08].

Defendants note that they did not look directly at each grantee's personal political affiliation, instead using "the content of the[ir] project" as a proxy. Gov't Br. 34–35. But the crudeness of Defendants' heuristic is not a defense: a First Amendment violation occurs when the government acts based on a *perceived* political affiliation, regardless of whether the perception is correct or the basis for

that perception. *Heffernan*, 578 U.S. at 276. The relevant question is whether "[t]he government acted upon a constitutionally harmful policy," not whether each grantee actually had the affiliation imputed to them. *Id.* at 273.

Finally, Defendants point out that a handful of Biden-era grants were retained. *See* Gov't Br. 36. That confirms rather than refutes Plaintiffs' claim. Every spared Biden-era grant was one that aligned with the Administration's priorities. *See* [Dkt.248-17_at_2] ("[W]e have only excluded [from termination] the ones that seem not to conflict with the Administration's priorities."). The retained grants did not clear any independent review for merit or satisfaction of program criteria—NEH's peer-review process was bypassed entirely—but rather a viewpoint filter. Biden-era provenance was a mark against a grant, rebuttable only by demonstrating ideological alignment with the current administration. "[T]he First Amendment will not tolerate the administration of subsidy programs with a censorious purpose." *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019).

## III. The Grant Terminations Violated Equal Protection.

Defendants also violated the equal protection guarantee of the Fifth Amendment in terminating grants through classifications based on race, ethnicity, national origin, religion, sex, and sexual orientation.

**A.** Under "our colorblind Constitution," *Allen v. Milligan*, 608 U.S. 511, 512 (2026), "[a]ll racial classifications, imposed by whatever federal, state, or local

governmental actor, must be analyzed by a reviewing court under strict scrutiny," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Strict scrutiny also applies to any classifications based on ethnicity, national origin, or religion. *See Graham v. Richardson*, 403 U.S. 365 (1971) (alienage, nationality, and race); *United States v. Brown*, 352 F.3d 654, 668 & n.16 (2d Cir. 2003) (religion). "[H]eightened scrutiny" applies to any "gender-based classification," *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728-30 (2003) (cleaned up), and to classifications based on sexual orientation, *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013).

Defendants unambiguously employed all of the above suspect classifications to identify grants to terminate. Fox used "Detection Codes" that were explicit in their targeting of grants based on racial, ethnic, national origin, and gender classifications, including, "BIPOC (Black, Indigenous, People of Color)," "Minorities," "Native," "Tribal," "Indigenous," "Immigrant," "LGBTQ," "Homosexual," and "Gay." [Dkt.248-9_at_25; Dkt.248-1_at_60]. Fox did not include analogous terms such as "White" or "Heterosexual." [Dkt.248-1_at_62].

Fox continued to rely on suspect classifications in developing the official list of grants to terminate. In asking ChatGPT to identify grants purportedly involving DEI, Fox never instructed ChatGPT to avoid identifying grants solely on the basis of race or other protected characteristics. [Dkt.248-1_at_53–55]. In hundreds of

cases where ChatGPT answered "Yes" that a grant involved DEI, its "DEI Rationale" makes explicit that the grant was classified as involving DEI—and thus slated for termination—because it involved a particular race or other protected trait. As one example, ChatGPT classified a grant about the Colfax Massacre as DEI because "[t]he documentary explores a historical event that significantly impacted Black civil rights." [Dkt.248-11_at_2]. ChatGPT stated that other grants should be terminated specifically because:

- "This biography explores the life and accomplishments of ... a Black lawyer and jurist" (biography of Oscar Adams Jr.)
- "This project analyzes the experiences and contributions of Black children in the Atlantic world, shedding light on their perspectives and resistance to slavery" (study on six child slaves)
- "The Kansas City workshop highlights diverse histories, including Black and Latinx communities, in the Jazz Age and Great Depression" (workshop on Kansas City in the 1920s and 1930s)
- "This proposal aims to expand understanding of Black life and geography during slavery" (project to develop maps identifying individual slaves and their families before emancipation)
- "This project focuses on the history and experiences of a Black community" (project collecting oral histories on Nashville's Bass Street Community)
- "The project uses historical research and Augmented Reality to showcase a demolished Chinatown, inviting reflection on the Asian American experience" (self-explanatory)
- "This project aims to restore the legacy of a marginalized woman writer" (project to disseminate the work of Rokhl Brokhes, a Yiddish writer)

[Dkt.248-21]. In none of these instances did ChatGPT mark the grant as DEI because it was non-meritorious. Rather, ChatGPT listed the grant as DEI because the grantee was pursuing a project involving people of a certain race, national origin, ethnicity, religion, or gender.

Fox adopted these classifications as his own. As the district court explained, "Fox copy-and-pasted ChatGPT's 'DEI Rationales' *verbatim* into his spreadsheets listing which grants purportedly involved DEI, and Fox included those same DEI Rationales in spreadsheets throughout the process of selecting grants to terminate." [Dkt.291_at_123] (citing record evidence). These rationales "became the operative rationale[s] for the grant[s'] termination[s]," making ChatGPT's "classifications ... the Government's own for constitutional purposes." [Dkt.291_at_112, 124].

What's more, "Fox affirmatively endorsed" ChatGPT's methodology. Fox testified that he classified any grant "focused on a specific race" as DEI and subject to termination. [Dkt.248-1_at_56]. More specifically, Fox testified that he identified as DEI any grant about a specific "minority group," meaning any particular "ethnicity, culture ... race or gender or religion." [Dkt.248-1_at_47, 49]. Regarding the grant about the Colfax Massacre, Fox testified that it was DEI and terminated because "[i]t focuses on ... a specific race, here being Black." [Dkt.248-1_at_56]. For a different grant about violence against women during the Holocaust, Fox testified that the grant was DEI and terminated because it was "specifically focused

on Jewish cultures" (as in, it was about the Holocaust) and the "voices of the females in that culture." [Dkt.248-1_at_49]. That testimony is not only "chilling," [Dkt.291_at_113]; it is a blunt admission of conduct that violates the Constitution's equal protection guarantees. *See* [Dkt.291_at_114] ("DOGE blatantly used protected characteristics as criteria for grant termination.").

In moving for summary judgment, Plaintiffs identified numerous specified grants that Defendants classified for termination solely because they involved persons of a particular race, national origin, ethnicity, religion, or gender, [Dkt.248-24], and Defendants did not deny that they classified those grants for termination on the basis of protected characteristics. They have thus waived any factual contention to the contrary. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004). And even *now*, Defendants admit that they "identif[ied] ... grants that focus on particular racial or other subgroups," including by "searching for racial terms." Gov't Br. 41–42. Defendants thus concededly "employed explicit classifications based on race, ethnicity, national origin, religion, sex, and sexual orientation," [Dkt.291_at_110], triggering strict or heightened scrutiny. Defendants do not argue they could meet these levels of scrutiny, and for good reason. The terminations were not narrowly tailored to any compelling state interest, and there is no compelling state interest in terminating grants solely because they involved people of a certain race or other protected group. Indeed, even if rational-basis review applied, terminating grants on

this basis is not rationally related to any legitimate government interest. *See* [Dkt.291_at_121–24].

**B.** Defendants assert that they were permitted to use explicit race, sex, religion, and sexual orientation classifications because the grants themselves were "constitutionally suspect." Gov't Br. 37–38. According to Defendants, "if *terminating* these grants based on their subject matter were held to violate equal protection, that would necessarily imply that *awarding* the grants in the first place also violated equal protection." *Id.* at 39. Defendants' insinuation that the terminated grants were *awarded* on a discriminatory basis is baseless. Defendants introduced *zero* evidence below that any grants had been awarded based on anything other than their humanistic merit. All the grants went through NEH's rigorous merit-based process. As the district court emphasized, "[t]here is no evidence that any Plaintiff received preferential treatment over an equally worthy applicant on any prohibited basis." [Dkt.291_at_118]. Only Defendants made such prohibited classifications.

Indeed, the notion that it is "constitutionally suspect" to award a grant to study violence against women during the Holocaust is as absurd as it is offensive. It does not "favor[] one racial group," Gov't Br. 37, to award a grant to study the Colfax Massacre, or to make a film on "the events surrounding the 1898 coup d'état in Wilmington, NC, in which white supremacists overthrew the multi-racial government of North Carolina's largest city." [Dkt.248-24_at_5, 18]. For

Defendants to suggest that the government engages in discrimination by funding such projects has no basis in law, fact, or common sense.

Defendants' assertion (at 37) that there was no "intentional discrimination" is not true, *see supra*, but it's also irrelevant: The Supreme Court has made clear that the government's "motives" are irrelevant to "the strict scrutiny analysis" where the government makes explicit racial classifications. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 741–42 (2007). That remains true even if Defendants took these actions based on a misguided view that doing so would remedy the prior administration's purported awarding of grants to advance DEI. *See Louisiana v. Callais*, 608 U.S. 85, 107–09 (2026); *Parents Involved*, 551 U.S. at 748.

Defendants also argue that strict scrutiny does not apply because they did not terminate grants "based on race or any other protected characteristic *of the grant recipient*." Gov't Br. 37–38 (emphasis added). But the Supreme Court has squarely held that the government violates equal protection when it discriminates against persons because of their affiliation, or "association," with others of a certain race. *Bob Jones Univ. v. United States*, 461 U.S. 574, 605 (1983). "Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race *or the race of his companions*." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970) (emphasis added). This Court, too, has recognized that "[t]he right to be free from race

discrimination on the basis of one's racial affiliation—intimate or otherwise—is, and has long been, clearly established." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014); *see also id.* at 70 (Raggi, J., concurring in part in the judgment and dissenting in part).

*Palmore v. Sidoti*, 466 U.S. 429 (1984), is especially instructive. There, a state court had granted custody to a child's father because the mother remarried a Black man. *Id.* at 430. The Supreme Court held that adverse treatment of the mother because of her affiliation with a Black person was a "racial classification": it was "clear that the outcome would have been different had petitioner married a Caucasian." *Id.* at 432–34. "Such classifications are subject to the most exacting scrutiny." *Id.* at 432–33.

Judge Friendly applied the same principle in *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702 (2d Cir. 1982). There, a nonprofit theater organization was dedicated to producing dramatic works "which particularly reach and involve the Black and Hispanic communities." *Id.* at 703. Although the organization had no racial identity of its own, this Court held that it could assert a violation of its own equal protection rights where it faced discrimination against its activities "on racial grounds." *Id.* at 706–07. The Court's decision addressed standing rather than the merits, but its reasoning directly undermines Defendants'

premise that a party may not bring an equal protection claim for racial discrimination unless it was discriminated against based on its own race.

Here, Defendants targeted grantees for termination because their projects were about a person or persons of a particular race or other protected characteristic. They terminated Dr. Bertis Deon English's grant because he wrote a biography about "a Black lawyer and jurist." [Dkt.248-24_at_4]. Vanderbilt University lost a grant because it sought to "restore the legacy of a marginalized woman writer." [Dkt.248-24_at_44]. Anyone whose grants focused on Native American tribes or cultures had their grants picked for termination. [Dkt.248-24]. These and other grantees were subject to discriminatory treatment solely because they—the grantees—were affiliated with people of a particular race, national origin, ethnicity, religion, gender, or sexual orientation. Heightened scrutiny applies.

Any other conclusion would produce absurd consequences. In Defendants' view, a public library could ban all books about Black people, or Jews, and there would be no heightened scrutiny. The U.S. Copyright Office could deny copyright protection to any works about Hispanic Americans, or women, and there would be no heightened scrutiny. That is not and cannot be the law. "Strict scrutiny [applies] to all racial classifications ... to smoke out illegitimate uses of race," *Johnson v. California*, 543 U.S. 499, 505–06 (2005), consistent with "the 'core purpose' of the Equal Protection Clause," which is "'doing away with all governmentally imposed

discrimination based on race,'" *SFFA v. Harvard*, 600 U.S. 181, 206 (2023) (quoting *Palmore*, 466 U.S. at 432). Defendants' approach is contrary to that core purpose.

In all events, as the district court held, the terminations do not survive even rational-basis review, because the classifications were not rationally related to a legitimate government interest. [Dkt.291_at_116]. Below, Defendants claimed interests in "prioritizing merit, eliminating preferential treatment, and reducing wasteful spending." [Dkt.291_at_116]. But there is no rational connection between those interests and race, sex, religion, or sexual orientation. Humanities works about Black people, women, Jews, or LGBTQ persons are not inherently wasteful or non-meritorious. [Dkt.291_at_117–24]. Indeed, those traits "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "Yet that is precisely how DOGE treated them—deeming grants wasteful because they related to Blacks, women, Jews, Asian Americans, and Indigenous people." [Dkt.291_at_120].

Defendants also claim a legitimate interest in carrying out the President's priorities related to DEI, as reflected in Executive Order 14151. Gov't Br. 41–42. That Executive Order, however, established a policy only to eliminate "illegal and immoral discrimination programs." Exec. Order No. 14151 § 1, 90 Fed. Reg. 8339

(Jan. 20, 2025); *see also id.* § 2(a) (directing the elimination of "illegal DEI and [DEIA] mandates, policies, programs, preferences, and activities"). Terminating a grant about the Holocaust—solely because it focuses on Jewish people—is not rationally related to eliminating "illegal and immoral" projects. Nor is there a rational relationship between the fact that Oscar Adams Jr. was a "Black lawyer" and whether it is illegal or immoral to fund a biography on him. In short, assuming *arguendo* that the Executive Order's stated policy of ending "illegal and immoral discrimination programs" is a legitimate government interest, there is no rational relationship between that interest and the termination methodology here, which was to terminate awards based on nothing more than the race, ethnicity, religion, sex, or sexual orientation of a project's subject matter.

Although rational-basis review is deferential, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446. Here, "the relationship is not merely attenuated; it is *nonexistent*." [Dkt.291_at_120].

## IV. The District Court Properly Certified a Class and Provided Classwide Relief.

Defendants' arguments regarding class certification should be rejected.[11] When the government applies a single policy uniformly to a defined group, and the

[11] Defendants' class certification arguments apply only to No. 26-1832.

group challenges that policy on grounds common to all, the claims are suited for classwide resolution under Rule 23(b)(2). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (cases challenging "unlawful, class-based discrimination are prime examples" of (b)(2) classes). That is exactly what happened here. Every class member's grant was terminated by the same boilerplate notice, drafted by the same DOGE operative, sent from the same unofficial email address, over the same typed signature, within the same three days. [Dkt.291_at_29–31, 131, 133; Dkt.248-33_at_41]. In certifying the class, the district court correctly identified a "single, top-down policy applied uniformly across the class." [Dkt.291_at_133].

Defendants call their class-certification objections "of a piece with" their merits arguments. Gov't Br. 46. That is their fundamental flaw. Each of Defendants' merits arguments relates to the entire class or an entire subclass: they argue that McDonald terminated *all* the grants; that they are *categorically* allowed to terminate grants based on their viewpoints and associations; and that they are *categorically* allowed to make racial classifications when terminating grants. Resolving these arguments does not require individualized inquiries; each class or subclass will "prevail or fail in unison" on each claim. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013).

Defendants argue that class treatment of the *ultra vires* claim was improper. This argument comes too late: Defendants did not argue below that there were

differences among class members with respect to the *ultra vires* claims. *See* [Dkt.268_at_9–16]. A court does not abuse its discretion by declining to resolve an argument no party made. *See Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994).

In any event, the argument fails. Defendants contend that class treatment was improper because some of the grants "were identified by" NEH staff as involving "DEI" before DOGE became involved. Gov't Br. 43. But the question isn't who first made suggestions about grants, but who exercised decisive control over the final termination decision. *See supra* Part I. The district court's answer to that question was uniform across the class: "DOGE, not the NEH Chair, exercised decisive control." [Dkt.291_at_82]; *see also* [Dkt.248-17_at_2] (McDonald stating that "[DOGE] will cancel" *both* the grants flagged by NEH staff and the grants flagged by Fox). In fact, while Defendants disagree on the merits, they argued below, and continue to argue here, that the *same* decisionmaker (McDonald) exercised final authority over *all* grants. Gov't Br. 9, 22, 24. Thus, the parties agree that one person made the final call for every class member. Commonality requires nothing more.

Defendants note that some grants in the Biden-Era Subclass were flagged for termination at different times, Gov't Br. 44, but that is a distinction without legal relevance. The operative criterion never changed. NEH directed its staff to review only grants awarded "from 2021 to the present." [Dkt.248-4_at_2]; *see also*

[Dkt.248-8_at_2] (Wolfson describing "historical review of NEH's grants since January 2021"); [Dkt.248-26_at_9] (testifying that NEH rated grants aligning with "the start of the Biden administration"). When DOGE later added the Biden-Era grants not marked "DEI" to the termination list, it presumed each one "wasteful" unless it "aligned with the [Trump] Administration." [Dkt.248-2_at_15]. Grants selected late in the termination process were selected on the same basis as grants selected early: they were associated with the Biden Administration.

Defendants suggest that because the district court "second-guess[ed]" whether particular grants actually implicated DEI, individualized inquiries would defeat class certification. Gov't Br. 44. In fact, the district court did the opposite. It held that "[i]t did not matter whether the [DEI] characterization was correct": "[o]nce [the DEI] label attached, the grant was marked for termination." [Dkt.291_at_135]; *see Heffernan*, 578 U.S. at 272 (government's policy, not the accuracy of its factual premise, determines the constitutional violation).

Finally, in arguing that some grant terminations would not be subject to strict scrutiny under the Fifth Amendment, Defendants ignore that the district court held that "DOGE's actions fail even under rational basis review." [Dkt.291_at_116]; *see* [Dkt.291_at_116–24]. Moreover, even if the non-suspect classifications could survive rational-basis review, the district court had no need to tailor relief on the Fifth Amendment claim to any subset of grants—its First Amendment and *ultra vires*

holdings independently support complete relief for every plaintiff and class member. [Dkt.291_at_133–34, 136]. The district court held that the legality of the Mass Termination is a question "capable of resolution in one stroke." [Dkt.291_at_138]. Defendants identify no abuse of discretion in that holding.

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,


*/s/ Daniel F. Jacobson*

Daniel F. Jacobson
John Robinson
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

*/s/ Jamie Crooks*

Jamie Crooks
Michael Lieberman
Amanda R. Vaughn
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street NW, Suite 304
Washington, DC 20004
jamie@fairmarklaw.com
michael@fairmarklaw.com
amanda@fairmarklaw.com
yinka@fairmarklaw.com


November 9, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because it contains 13,999 words, not counting portions of the brief listed in Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in Times New Roman 14-point font.

/s/ *Jamie Crooks*
Jamie Crooks

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in these cases are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Jamie Crooks*
Jamie Crooks